MAKEPEACE BROS. INC. *vs.* TOWN OF BARNSTABLE & others.

Barnstable.    October 7, 1935. — November 26, 1935.

Present: RUGG, C.J., PIERCE, FIELD, LUMMUS, & QUA, JJ.

*Proprietors of Common Lands.    Easement.    Barnstable.*

The records in Barnstable showed that in a division of common lands on Sandy Neck in 1714–1715 the fee in a strip twenty rods wide from high water mark along Cape Cod Bay, and in certain "try-yards," was not reserved, but passed as parts of lots set off; and that an easement reserved in such strip and "try-yards" was for whale fishing only, not fishing in general, and therefore terminated with the cessation of whaling in the vicinity.

PETITION, filed in the Land Court on January 24, 1933.

The case was heard by *Davis,* J.

*C. C. Paine,* Town Counsel, for the respondent town.

*H. Williams,* (*T. Otis* with him,) for the petitioner.

PIERCE, J.    The petition seeks registration of title to a tract of over seven hundred acres with a frontage of about two miles on Cape Cod Bay at Sandy Neck in Barnstable, Massachusetts, and is before this court on an appeal by the town of Barnstable from a decision of the Land Court ordering a decree for the petitioner for registration of said land.

The material facts set forth in the decision of the Land Court are as follows: "Sandy Neck forms the greater part of a peninsula, about seven miles long, that stretches easterly along the shore of Sandwich and Barnstable between the Bay on the north and the marshes, estuaries and Barnstable Harbor on the south.    The portion in Sandwich is called Scorton Neck.    From Scorton Neck the portion in Barnstable is called Sandy Neck, and extends easterly to Sandy Neck Light, situated on the point at the westerly entrance to Barnstable Harbor.    The tract which constitutes locus in this case is about two and a half miles to the east of Scorton Neck, and about a mile to the west of the light-

house.   The easterly and westerly boundaries are defined.
The tract consists of sand dunes, of beach upland, the latter
interspersed with patches of beach grass and shrubs, and
of one or two marsh lots, and contains a little over one hun-
dred cranberry bogs.   The modern cranberry has been
developed by cultivation and selection from wild berries.
All of the bogs on present locus are made bogs.   Beach
plums and wild cherries formerly grew in profusion on the
Neck, including locus.   The beach proper lies between the
sand hills and the waters of the Bay, but the whole of
Sandy Neck has been locally known as 'the beach.'   Access
to Sandy Neck has usually been by boat from the Harbor.
Access by land is over a public way leading to Scorton
Neck just to the west of the Sandwich line, and thence
down the Neck along the strip of hard land that in such
conditions is always to be found where marsh and beach
upland join.   The petitioner claims as appurtenant to its
land a right of way over such strip to and from said public
way.   A number of respondents have appeared and answered,
some denying the claim, and some asserting a claim to a
similar right of way, as appurtenant to their lots, over
locus.   These claims have all been adjusted by stipulation.
So far as the petitioner's claim effects [*sic*] other land owners
who have not appeared, I find that such has constituted the
customary and only means of access to Sandy Neck, in-
cluding locus, and has been in continuous use as such for
a great many years, the exact location varying somewhat
from time to time as the line of the hard strip between
marsh and beach upland varies from natural causes; that
such right of way is appurtenant to the land of the peti-
tioner; and that the latter in its turn, is subject to a similar
right of way appurtenant to adjoining marsh lands on the
south, and to the rest of Sandy Neck and its adjoining
marshes to the east.   There is one tract of land included
in this petition known as the Crocker Try-Yard Marsh
and situated at the southeast corner of locus on Barnstable
Harbor, bounding easterly on Bass Creek, to which the
record title to an undivided interest is outstanding within
twenty years in one of the Crocker heirs who cannot be

found.  As to this tract, which is definitely located, the petition is to be dismissed without prejudice.''

There is a controversy as to another tract, referred to and dealt with in the decision of the Land Court, called the Loring tract.

The main controversy is between the petitioner, the town and the Commonwealth, and concerns certain try-yards and a strip of land twenty rods wide adjoining the waters of the bay.  Counsel for the town represents the Attorney General by special delegation.  Complete record title prior to 1874 has not been found by the examiner. The Barnstable County records were destroyed by fire in 1827.  No issue is raised as to the exact status of the title to land in the early days of Plymouth Colony, because ''the marsh lots were set off in severalty in 1697, and the upland lots were, under the authority of the Town, set off in severalty by the Proprietors in 1714–15.''  Rights in the aforesaid ''try-yards'' and in the ''strip of hard land'' depend on the effect of certain reservations and provisions which were considered in the course of that division.

Before that time, in 1643, the town had voted ''that the commons should belong to the Inhabitants.  In 1658 an order was passed for a method of division in severalty.  In 1682 the Colony passed an Act providing for meetings of Proprietors of Common Lands and for making division thereof.  In 1687 the Town voted that all common meadow land be divided 'to them to whom of right it doth belong,' and 1691 a committee was appointed to determine that matter, which reported in January 1693–94.  In 1697 the marsh at Sandy Neck was divided accordingly, and in connection therewith it was in 1698 voted that the proprietors of the lots have liberty to maintain a fence to prevent creatures from coming on to the Neck and doing damage. In 1701 the Town voted a committee to determine who are the proprietors of the remaining common lands.  In 1703 such committee was chosen and reported the list, the rights to be computed on a basis of 6000 shares.  In 1692, by Province Laws Chapter 29, proprietorships had been given the right to sue and be sued.  The Proprietors Rec-

ords, as separate records, begin with the report and list of
1703. In 1706 there was a division of the wood lots, and
in 1708 of the planting lots. In 1711 it was voted that . . .
stranger[s] who shall come and settle at Sandy Neck to go
on whaling voyages, and not having an interest themselves,
shall pay for their fire wood, but that this is understood
not to comprehend town inhabitants."

At a proprietors' meeting of February 16, 1714–15, it
was voted that the common and undivided lands should be
divided provided there can be a "sutable sceem Layed for
the same"; and it was also voted at said meeting that
notwithstanding said division there shall be "Reserved a
Priviledg of twenty Rods from High water mark at ordinary
Tides on the north side of Sandie neck for the use of the
Proprietors or inhabitants of this Towne suysessuely to
build Their fishing houses upon & to use for the benifit of
fisherie." At an adjourned meeting on February 21, it was
voted that there should be a committee chosen to draw a
"skeem for the divition of the Common Land of this
Town," and a committee of seven was chosen. At a meet-
ing on March 9, 1714–15, it was voted "that all the Common
Land of the Town be Layd out in two divitions to wit:
the Land on this side in one and Sandie neck in one other
divition and into such Lots as may best accomodate the
whole allowing all sutable and Convenient waies in such
divitions; & sume other spots or small percils for publique
uses; & that there bee a Comtee Chosen to draw sume
generall directions for ye men yt shall be chosen to Lay out
sd Lots to proseed by against an other meeting." At a
meeting on April 11, 1715, it was reported that the com-
mittee appointed by the proprietors to draw up general
directions for the laying out of the remaining common land
pursuant to the former vote of the proprietors were of the
opinion "yt Sandieneck be Layed out into Sixty Lots As
equal in value as may bee for Quantity & Quality Consid-
dered spesiall Regard being had to ye wood Reseruing Privi-
ledg & use of four spots or pesses for the seting up four Try
houses of about half an acre to each for ye Laying blubber
barrils wood & other nessesceries for ye trying of oyl as

need may Requir Reseruing or Leauing all Convenient waies pticulerly waies from ye twenty Rods Reserued on ye north shoare to sd try houses & so down to ye south shoare for Landing bots & tacking of oyl & what els may be nessescary." The lots as laid out and described in the record are bounded on the north by the sea. In two of the lots included in the present locus there is a provision that there shall be allowed in the case of one "a try-yard" and of the other the "liberty of a try-yard as is provided on record."

At the end of the record of the description the following appears: "There is a Cartway alowed from ye back side at ye Whale housing to ye Triyards on ye south side & so to ye Landing near as it now goeth or at ye most convenient Place: And for as much as it is impracticable to fix & keep ways on such uncertain ground it is therefore ordered & determined yt there shall be free egress & Regress alowed as well from Lot to Lot as from ye one end of ye Neck to ye other & also across ye same as necessary occasions shall call for, He or they yt shall pass throw any fence or Inclosure to put up ye same    There is alowed & ordered yt there shall & may be two Try-Houses set up, & Liberty of two Try-yards ye one in ye Lot where Bursleys Hous stands & ye other in ye Lot adjoyning to that on ye west side wth all convenient ways to and from ye north & south shoar at ye most convenient Places there abouts."

The respondents claimed (1) that the town was vested with the fee in the twenty-rod strip and in two try-yard sites which were either excepted or reserved and became and remained vested in the town, or (2) that an easement for the benefit of the inhabitants of the town was thereby created which is still in existence and vested in the town, or (3) that there was a reservation or dedication for public purposes. The petitioner contended that the title to the different lots passed by set-off in severalty and in fee, bounded by the sea, and that the reservations were an easement only, which, if valid at all, was for a limited purpose and has now expired. The Land Court found in accordance with the petitioner's contention that by the division sever-

ally the fee in the land at Sandy Neck vested in those individuals by whom the lots were drawn, and that although an easement for a limited purpose, i.e., whaling, had been created the easement was extinguished upon cessation of the use of try-yards for whaling purposes. The Land Court found also that there was no dedication of the land for public purposes because the scheme of division was a purely local one for the benefit of the inhabitants of the town.

The question arises, therefore, as to the effect of the various votes of the proprietors. It is the contention of the respondents that the clause "there shall be reserved a privilege of twenty rods" is a public declaration on the part of the proprietors that the twenty-rod strip is reserved from being granted to any individual proprietor, and that that strip is set apart for public use; and that by the use of the word "successively" the proprietors made it plain that their intent was that the strip was reserved not only for their own use but also for the use of succeeding generations of the inhabitants of the town of Barnstable. The answer to this position is that it appears, and indeed it is not disputed by the respondents, that the proprietors could by vote pass title to common lands in making a division of such lands. *Rumford School District* v. *Wood*, 13 Mass. 193, 199. *Gloucester* v. *Gaffney*, 8 Allen, 11, 13. *Tappan* v. *Burnham*, 8 Allen, 65, 71.

The decision of the Land Court, that title to the land at Sandy Neck passed to those by whom the lots were drawn in the division, is supportable by the record. The land reserved was described as being "twenty rods from High water mark." The lots in the division as described in the record were bounded by the sea. In such circumstances the land to high water mark passed, by virtue of the description and of the vote accepting such division, to those individuals who drew these lots. *Niles* v. *Patch*, 13 Gray, 254, 257. *Boston* v. *Richardson*, 105 Mass. 351, 355–356. *Litchfield* v. *Scituate*, 136 Mass. 39, 47.

The votes of the town passed in 1731–32 regulating pasturage of horses on Sandy Neck, and the declaration as to the title of the town thereto; the vote of the town in 1831 to

take possession of Sandy Neck, cultivate cranberries and license the picking of cranberries; and the report of a committee appointed to find out what rights, if any, the town had in Sandy Neck, which were offered in evidence and received by the Land Court, on the contention of the respondents that they showed an accepted interpretation of the meaning of earlier votes on which the respondents rely, were properly admitted. These later acts are as consistent with the exercise of police power as with the claim of title, and were found by the Land Court to be instances of the exercise of such power. Compare *Randolph* v. *Braintree,* 4 Mass. 315, 318. Indeed, in an action by the now respondent town for trespass upon Sandy Neck it was decided, in 1841, that the town had no title to the premises in question and therefore it could not exclude others from picking cranberries on Sandy Neck. *Barnstable* v. *Thacher,* 3 Met. 239, 244. The fact that in grants of the petitioner's predecessors before 1896 the twenty-rod strip was not included and therefore did not pass to the grantees does not aid the respondent town to establish its title. Compare *Harvey* v. *Sandwich,* 256 Mass. 379, 383. As against the petitioner's own earlier predecessors this is ample evidence to sustain a title arising from adverse possession. The respondent's claim of title is not strengthened by any theory of estoppel by deed, since the respondent was neither party nor privy to such deeds but is in the position of a stranger thereto. *Holt* v. *Sargent,* 15 Gray, 97, 102. It is plain the rights of the town do not include any title in fee to the locus which is claimed here by the petitioner.

We now consider the question, Has the town acquired for itself or for its inhabitants any rights less than the fee and are such rights outstanding? If the town acquired an easement for general purposes such an easement would not be extinguished by reason of mere nonuser. *Brooks* v. *West Boston Gas Co.* 260 Mass. 407, 410. If the right reserved was for the purpose of fishing in general the fact that it had been used for the purpose of whaling only would not prevent later use of the servient tenement for other kinds of fishing. *Holt* v. *Sargent,* 15 Gray, 97, 102. Compare *Rajew-*

*ski* v. *MacBean,* 273 Mass. 1, 6. On the other hand, if an easement is stated to be for a particular purpose it is limited to the purpose stated. *Cornell-Andrews Smelting Co.* v. *Boston & Providence Railroad,* 215 Mass. 381, 388. *Crullen* v. *Edison Electric Illuminating Co. of Boston,* 254 Mass. 93, 94. *Sargeant* v. *Traverse Building Trust,* 267 Mass. 490, 495. When a right in the nature of an easement is incapable of being exercised for the purpose for which it is created the right is considered to be extinguished. *Central Wharf & Wet Dock Corp.* v. *Proprietors of India Wharf,* 123 Mass. 567, 570. *Brooks* v. *West Boston Gas Co.* 260 Mass. 407, 411. Warranted by the evidence the Land Court found that the rights reserved or created by the votes and set-off related only to the whale fishing industry, and ruled that such rights were extinguished upon the disappearance of the whale fishing industry from the vicinity. The finding was final. *Levenson* v. *Ciampa,* 251 Mass. 379, 382. *Rice* v. *Vineyard Grove Co.* 270 Mass. 81, 85. And assuming the facts to be as found, the ruling was correct.

It remains to consider whether the various votes incorporated into the record establish that the finding and ruling of the Land Court above stated are erroneous. Old records are not to be scanned too closely and they are to be interpreted, so far as is legally possible, in the light of the circumstances under which the parties to them acted when they were made, and the intent of the parties thus found will be carried into effect. *Wrentham* v. *Norfolk,* 114 Mass. 555, 562. *Attorney General* v. *Tarr,* 148 Mass. 309, 314. The respondents contend that the finding of the Land Court is erroneous because of the vote of February 16, 1714–1715, which was to the effect that the reservation is for the benefit of fishery and that therefore all kinds of fishing were included. This vote was not the sole vote taken in this regard and it was not the most important. This vote was part of a general vote that the common land should be set off in severalty, and the part which is here material is cast in very general terms without any attempt to set forth a method of division. Indeed it was not until later that a committee chosen to draw up general directions to govern

those making the set-off filed its report. The vote concerning the method by which the division was to be made spoke only of reserving try-houses and other necessaries for the trying of oil. Under the actual terms of the division the only specific reservations material were try-yards, liberties of try-yards, whaling houses and ways leading to and from these houses. An earlier vote, directed against strangers coming on Sandy Neck for purposes of whaling, also shows that it was the whaling industry rather than the fishing industry in general which the proprietors sought to regulate and secure to themselves. The documents, the votes and the actions of the town through 1731–32 support the finding of the Land Court as to the purpose of the reservations, and this finding does not appear to be clearly wrong. The record considered as a whole supports the Land Court's finding that the land reserved was not dedicated to public uses because the scheme was essentially local in character. It is unnecessary to consider further the contentions of the respondents.

*Order for decree affirmed.*