Elmer Raymond **HUDSON** et al.,
Complainants,

v.

**The AMERICAN OIL COMPANY,**
Defendant.

No. 529.

United States District Court
E. D. Virginia,
Newport News Division.

July 3, 1957.

E. Ralph James, Hampton, Va., and J. B. Cowles, Jr., Williamsburg, Va., for complainants.

Hunton, Williams, Gay, Moore & Powell and Ralph H. Ferrell, Jr., Richmond, Va., Murray, Ford, West & Wilkinson and Charles E. Ford, Newport News, Va., for defendant.

HOFFMAN, District Judge.

During the year 1952 Pan American Refining Corporation (referred to as Pan-Am) acquired the rights of another oil company under certain options to purchase large tracts of land in York County, Virginia, for the purpose of constructing and operating a primary petroleum refinery. Pan-Am is the parent corporation of the defendant, The American Oil Company (referred to as Amoco), and, having acquired title to the various parcels of land, proceeded to convey the same to Amoco.

In an action instituted by certain owners of residences located on the southern shore of the York River in a section known as Goodwyn's Neck in York County, with particular reference to Block 1, Section B, Plan of Waterview, twenty-four complainants seek an injunction to restrain defendant from blocking or interfering with the use of a 30-foot private road easement extending in a southerly direction from Route 631, also known as Waterview Road, to Route 630, also known as Goodwyn's Neck Road. Additionally, complainants request a mandatory injunction requiring defendant to remove all materials and structures which have been placed on either the 30-foot road easement or Route 630, which would interfere with the use of said roads by complainants. The residences of said complainants are bounded on the north by the York River and on the south by Route 631. It is conceded that defendant has caused large and valuable structures to be erected in locations blocking the use of the roads in question.

Defendant filed a motion to dismiss as to the complainant, Margaret E. Moore, and a motion for summary judgment as to all complainants. For reasons herein stated the motions must be granted.

Disregarding for the moment the motion to dismiss, the determinative question appears to be:

Does the cessation of purpose doctrine apply where a private road easement has been granted for the purpose of ingress and egress to and from secondary highways and one of said highways has been legally abandoned, thus leaving the holders of the private road easement with a means of ingress and egress through the medium of the remaining secondary highway but requiring a greater distance to travel?

It is essential to view the numerous plats introduced in evidence to visualize the situation as it existed before and after Amoco erected its plant. For the purpose of this opinion it is deemed sufficient to incorporate by reference three plats—one illustrating the location of roads as of January 29, 1942; the other two showing the status of roads, subject to a minor variation, as of November 30, 1955—August 13, 1956, and after the completion of the tripartite agreement dated September 1, 1954.

MAP OF GOODWYNS NECK

AS OF JANUARY 1943

SCALE 1" = 500'     FIGURE 2

MAP OF GOODWYN'S NECK
As of November 30, 1955 - August 13, 1956

SCALE 1"=1500'   FIGURE 5

53-E

Legend
Public Road
Temporary Public Road
Former Private Road Easement

MAP OF GOODWYN'S NECK

Showing Roads Upon Completion of
Tripartite Agreement Of 1 September 1954

SCALE 1"=1500'    FIGURE 6

53-F

Legend
— Public Road.
····· Former Private Road Easement.

Referring to the 1942 plat, it will be noted that the private road easement is shown by a dotted line connecting a private road easement as an extension of Waterview Road (now Route 631) and Route 630, also known as Goodwyn's Neck Road. The 1942 plat is selected by the Court,. as the 30-foot private road easement was created by deed and agreement dated January 29, 1942, between the then owners of the adjacent properties, namely, Lewis, Coleman and Pohlig. This agreement will be referred to as the Lewis-Coleman-Pohlig deed. Prior to this date there existed a winding easement through parcels E and F as shown on said plat which, according to the evidence, was low land rather unsuitable for vehicular travel. The Lewis-Coleman-Pohlig agreement gave to Pohlig the parcel known as F, thus granting to him certain frontage on the York River, in exchange for which Pohlig surrendered his winding private road easement acquired by a predecessor in title and accepted two private road easements —one extending Waterview Road in a direct line to the east, the other running along the eastern boundary of the Pohlig property in a southerly direction connecting Waterview Road as extended by the new private road easement and Route 630.

Upon the recordation of the Lewis-Coleman-Pohlig deed of 1942, the parties to the agreement and their successors in title were thereby afforded two means of ingress and egress to and from their lands. The subdivision of Section B, Plan of Waterview, brought about the sale of lots to the complainants who acquired the rights under said easements. The complainant, Margaret E. Moore, is the successor in title of the Pohlig interests, acquiring what is shown on the earlier plat as parcels C and F, but she thereafter sold that portion of her property lying south of Waterview Road to Amoco's predecessor in title. Certain portions of the Lewis-Coleman-Pohlig deed and agreement of January 29, 1942, in which the two private road easements were created are noted as follows:

"1. All of the parties hereto do hereby grant, bargain, sell, and convey to the other of the parties hereto an easement of right of way in common to be used jointly by the said parties and their respective heirs and assigns, in and to the roads shown on the blueprint map hereinabove mentioned designated as Waterview Road and as 30 foot road, through and along the lands shown on said blueprint map, as a means of ingress and egress to and from the lands thereon shown, over, along and upon the entire length of the said roads shown on said blueprint map out to the public highway known as Goodwyn's Neck Road, including access to such Goodwyn's Neck Road along said 30 foot road, as well as along the Waterview Road, both in its respective 30 and 40 foot widths and locations. To effectuate this understanding and agreement the first and second parties grant and convey such right of way to the third parties; and the first and third parties grant and convey such right of way to the second parties; and the second and third parties grant and convey such right of way to the first parties; all of which rights of way shall be appurtenant to the respective lands owned by the respective parties; and shall inure to the said parties respectively and their respective heirs, assigns and successors in title * * *

"3. The Waterview Road shown on said blueprint map and the 30 foot road shown thereon, leading from said Waterview Road in a southerly direction, and thence in a southwesterly direction out to the Goodwyn's Neck Road, are both of the width of 30 feet, except at the intersection of said two roads, at which intersection the corners are to be curved and widened as shown on said blueprint map.

* * * * * *

"8. There shall be no obligation on the part of any party to this agreement to construct or maintain any of the roads herein mentioned shown on said blueprint map, or to bear any expense in connection with said construction or maintenance.

"9. The parties hereto covenant and agree that at such time or times as the dedication thereof will be accepted, either by the County of York or the Commonwealth of Virginia or any other appropriate public authority, to dedicate by some proper legal instrument or action the said Waterview Road and the said 30 foot road hereinabove mentioned, as shown on said blueprint map, including the turn-around space thereon shown, except that such turn-around space, if and when dedicated, shall be subject to the termination of such dedication upon the extension to the east of said Waterview Road, so as to connect with any public road. This provision shall be binding upon the parties hereto and their successors in title. It is further understood and agreed that the said Waterview Road and the said 30 foot road herein mentioned are subject to use by the appropriate corporations, including municipal governments, for the construction, operation and maintenance of public utilities, including telephone, telegraph, water and sewerage, in, along, over, under and across the said roads."

The manifest purpose of the foregoing agreement in establishing the 30-foot private road easement was to obtain access to Goodwyn's Neck Road (Route 630). The agreement carried no obligation of maintenance and granted to the County of York or Commonwealth of Virginia a continuing offer of dedication. In due time, and at varying intervals thereafter, the offer of dedication for the extension of Waterview Road (now Route 631) was accepted and a secondary highway was established pursuant to Virginia law. There has been no acceptance of the continuing offer of dedication as to the 30-foot private road extending southerly and connecting Waterview Road and Route 630. The defendant, having acquired the fee simple title to all of the land south of Waterview Road to a point which is approximately indicated on the third plat as (new) Route 173, has, pursuant to an understanding with the County of York and Commonwealth of Virginia, brought about an abandonment of Goodwyn's Neck Road (Route 630).[1]

Assuming arguendo that Route 630 was legally abandoned, has the purpose for which the 30-foot private road easement was originally created now failed, and is such easement now abolished by reason of such cessation of purpose? The so-called easement no longer connects with Goodwyn's Neck Road—at best it leads to a portion of defendant's refinery and stops at that point. While the intent and purpose of complainants' insistence upon relief by way of injunction is not material to determine at this stage of the proceedings on summary judgment, it is apparent that complainant's land values may have been adversely affected by reason of the erection of the refinery in the immediate locality. As Amoco had a legal right to construct its plant in the area selected, there exists no grounds for legal complaint unless, of course, some legal interest of complainants has been acquired or destroyed contrary to law.

At the southern end of the 30-foot private road easement, Route 630 follows an easterly course to Dandy and a southerly course to Hornsbyville. Even after the completion of defendant's project, a small portion of Route 630 still connects with Route 631 at the southwestern corner of defendant's property. In any event, the easement in question created by the Lewis-Coleman-

---

[1]. The abandonment proceedings were actually conducted by the County, with the approval of the Commonwealth, but it is readily conceded that the abandonment of Route 630 was a necessary corollary to defendant's project.

Pohlig agreement of 1942 carried with it no assurance that Route 630 would not be abandoned in whole or in part. To hold otherwise would substantially preclude the legal abandonment of any highway to which a private road easement may be connected. Manifestly, such a theory may not be accepted where the "necessity" for such easement no longer exists.

From a practical standpoint the "necessity" for the use of the 30-foot private road easement ceased to exist following the paving of the extension of Waterview Road in an easterly direction which, according to the evidence, was in 1948 or 1949. True, the 30-foot private road easement extending southerly 0.445 miles was convenient for such complainants as desired to travel to Dandy or the area designated as York Glen.[2] Now that the project has been completed, complainants are able to reach York Glen by traveling a matter of a few yards; those desiring to go to Dandy are required to follow Route 631 in an easterly and then southerly direction to Route 630, along Route 630 southeast to Route 173, and hence following the northern bank of Back Creek along Route 173 to Dandy, all involving a distance of 2.375 miles longer than the route made available by the 30-foot private road easement and Route 630; and, finally, one going to Hornsbyville is required to traverse an excess distance of 0.37 miles.

The condition of the 30-foot private road easement is a factor to be determined in considering any "necessity" for its continuance and in weighing the factors leading to the conclusion that the cessation of purpose doctrine should be applied. At best, it was an old farm road with tracks for one vehicle, at the southernmost end of which there was a large hole of some 15 feet in width where water frequently accumulated.

The wooded area made it necessary to cut the brush and overhang of the trees, but the evidence indicates that the road could be used for vehicular travel prior to the date defendant commenced its grading of the area.

■ Totally aside from the practicalities presented, it is sufficient to state that, from the face of the instrument creating the 30-foot private road easement, the purpose of the easement has ceased to exist upon the abandonment of Route 630. Since this action was instituted subsequent to the abandonment by properly constituted public authorities, there remains no property right to protect. It is fundamental that, from the very nature of an easement, a dominant tenant may make use of property owned in fee by the servient tenant *for certain purposes*. The servitude cannot be increased for additional purposes and, *a fortiori*, when the easement cannot be exercised for the use for which it was created, it ceases to exist.

■ The Supreme Court of Appeals of Virginia has not had occasion to pass upon the failure of purpose doctrine and, in the absence of a controlling decision from that Court, it must be assumed that the weight of authority should prevail.

*Minor on Real Property* has long been recognized as an authority in Virginia for land problems. In the Second Edition, 1928, Vol. 1, § 106–107, pp. 145–146, the seven methods of extinguishing an easement are referred to and, as to the first named method, it is said:

"Easements once created may be extinguished in the following ways: (1) By a cessation of the purposes for which the easement was created; * * *

\* \* \* \* \*

"If the particular purpose for which the easement is granted is

2. Prior to defendant's acquisition of its holdings, the York Glen residents held a private road easement to Route 630, but defendant arranged for the extension of Route 631 to York Glen and acquired this private easement by negotiation with the owners. The York Glen private easement was one of "necessity" as it was the only means afforded the residents to connect with any highway.

fulfilled or otherwise ceases to exist, the easement also falls to the ground.

"In determining questions of this sort, the terms of the grant, or, if it be implied, the circumstances for which the implication arises, are to be looked to in order to ascertain the scope and extent of the easement * * * "

Such is the rule set forth in 17 Am. Jur., "Easements" § 137, p. 1023, and 28 C.J.S. "Easements" § 54 a, p. 718. Cases from other states similarly support this view. Holden v. Palitz, 2 Misc. 2d 433, 154 N.Y.S.2d 302 (involving the extinguishment of an easement by reason of the abandonment and relocation of a street); McGiffin v. City of Gatlinburg, 195 Tenn. 396, 260 S.W.2d 152; Makepeace Bros., Inc., v. Town of Barnstable, 292 Mass. 518, 198 N.E. 922; Central Wharf & Wet Dock Corp. v. Proprietors of India Wharf, 123 Mass. 567; Hancock v. Wentworth, 5 Metc., Mass., 446; Town of Freedom v. Norris, 128 Ind. 377, 27 N.E. 869; Beim v. Carlson, 209 Iowa 1001, 227 N.W. 421. Indeed, in complainants' brief no authorities are cited to the contrary.

■ It is elementary that an easement is one of the rights which may be extinguished or destroyed by act of God, *operation of law*, or act of the party. Washburn on Easements and Servitudes, 4 Ed., pp. 699–703. As is said in Tiffany on Real Property, 3rd Ed., Vol. 3, § 817, pp. 368–369:

"It has been said that when an easement is created for a particular purpose, it comes to an end upon a cessation of that purpose, which means, apparently, that an easement which is created to endure only so long as a particular purpose is subserved by its exercise, comes to an end when it can no longer subserve such purpose. The question then is, in each case, what is the particular purpose to be subserved by the easement, and this, in the case of an easement created by grant, is a question of intention.

* * * * * *

"An easement to use a dock or waterway for vessels has been regarded as coming to an end when, owing to the construction of a street by the municipality, such use of the dock or waterway becomes impossible. And an easement to be exercised for the benefit of a particular lot has been considered to cease when the lot became permanently submerged by the waters of a river, or the lot was appropriated for a street. Likewise, a right of approach to an upper room or floor in a building was held to come to an end when the building was destroyed. So, in the case of the grant of a right of way for a railroad, a reservation in favor of the owner of the land of the privilege of a crossing, by which to pass to other land belonging to him, was construed as giving such crossing so long only as the two pieces of land belonged to the same person. In these various cases the easement, being one created by grant, came to an end, it is conceived, because it was intended, or presumed to be intended, to come to an end upon an event such as occurred, rather than as occasionally suggested, because the impossibility of the exercise of an easement, or the impossibility of its exercise for the same purpose as before, necessarily involves its extinguishment * * * "

■ Holding that the cessation of purpose doctrine is applicable in this case, we now turn to the attack made by complainants upon the legality of the abandonment proceedings as to Route 630. It does not follow, as a matter of law, that the doctrine should be applied if the abandonment of Route 630 was contrary to the laws of Virginia.

Route 630 was abandoned in varying stages by the duly constituted authorities while the new road was in process of construction. As a part of the secondary system of highways, the Board of Supervisors, with the knowledge, con-

sent and approval of the State of Virginia Commissioner, proceeded under § 33–76.12 of the Code of Virginia 1950, which provides:

> "When any road in the secondary system *or* any road in the secondary system containing a railway-highway grade crossing, has been or is altered and a new road, which serves the same citizens as the old road is constructed in lieu thereof and approved by the State Highway Commissioner, the old road and/or the public crossing may be abandoned to the extent of such alteration, but no further, by a resolution of the board of supervisors or other governing body of the county, declaring the old road and/or the public crossing abandoned."

The foregoing section is entitled "Alternative procedure for abandonment of old road or crossing to extent of alteration". Complainants insist that the Board of Supervisors of York County should have adopted the procedure prescribed in § 33–76.8 of the Code of Virginia 1950, which provides for the posting of a notice of application for abandonment, publication of such notice, and a right of public hearing upon petition of any landowner in the county affected by such proposed abandonment. The next succeeding statute (§ 33–76.9) grants a right of appeal to the Circuit Court of the County as to any landowner —petitioner or the State Highway Commission, with the Court being charged with the responsibility of determining (1) whether public necessity exists for the continuance of the section of the road sought to be abandoned *or* (2) whether the welfare of the public will be best served by abandoning the section of the road.

■ At first blush it would appear that the so-called "alternative procedure" was created by the General Assembly of Virginia primarily to meet the need of abandonment in situations involving railway-highway crossings. It will be noted, however, that the language making the statute applicable to secondary roads containing a railway-highway grade crossing was inserted by an amendment in 1952. The 1950 Act made no such provision. Additionally, it is observed that the alternative procedure became a part of the statute law in 1940 in essentially the same form as it appears in the 1950 Acts, but containing at the very end of the statute (§ 1975ww, Code of Virginia 1942) the words: "provided, however, that this act shall in no way affect the statutory procedure for discontinuing a road where no new road is constructed to take its place." It is, therefore, perfectly clear that the General Assembly intended to specify two procedures available to the governing bodies in abandoning roads in the secondary highway system. The underlying purpose of the two sections appears to rest in the construction of a new road under the alternative procedure (§ 33–76.12), whereas the more complicated procedure (§ 33–76.8) makes no provision for the construction of a new road in lieu of the abandoned road.

Admittedly, a new road was constructed in the instant case. It is designated on the last map shown herein as (new) Route 173. It was duly approved by the State Highway Commissioner as required by the statute. A glance at the second map illustrated in this opinion will reveal that the abandonment of Route 630 was accomplished at varying intervals and, during the course of same, Amoco was required to bring about the construction of Temporary Route 630 pending the completion of (new) Route 173. It is unnecessary to point out the several actions of the Board of Supervisors in abandoning sections of Route 630 as this is evidenced by certified copies of the Board's minutes.

■■ The main contention of complainants is that the Board has disregarded that portion of § 33–76.12 which requires that the new road must *serve the same citizens as the old road*. On four separate occasions the Board declared that the new road would "serve the same citizens as the old road". As the General Assembly made no provision

for an appeal to any court, from the resolution of the Board making such a finding, it must be assumed that courts were not intended to review such findings in the absence of fraud or manifest abuse of discretion. 25 Am.Jur., "Highways", § 120, p. 418; Elliott on Roads and Streets, 4th Ed., Vol. 2, § 1182, p. 1683; City of Lynchburg v. Peters, 145 Va. 1, 133 S.E. 674. Fraud is not alleged or contended. While counsel for complainants insist that the Board manifestly abused its discretion in determining that the new road served the same citizens as the old road, the evidence does not justify this contention. Nor can it be said that complainants are in the class of citizens who were being "served" by Route 630. They had no express or implied private right of passage over Route 630, either by grant or prescription. Assuming that the "necessity" at one time existed, the extension and paving of Waterview Road (Route 631) removed this "necessity" prior to the date Amoco and its predecessor in title acquired the property adjacent to the 30-foot private road easement and Route 630. As is said in Minor on Real Property, 2nd Ed., Vol. 1, § 98, p. 135:

> "In the case of ways of necessity, it is the intention of the parties that is sought to be inferred from the uselessness of the land to the grantee unless such a right of way be implied. Whether degrees of uselessness may be admitted as a ground of determining this intention is a question upon which the courts are divided. Upon principle, it would seem that, if there already be another mode of access to the land, though much less convenient, or more expensive to develop, the reason for the inference of a grant of a way by necessity ceases."

To hold that the Board was guilty of a manifest abuse of discretion in granting the abandonment of portions of Route 630 would render nugatory the provisions of § 33–76.12, and would, in substance, preclude the abandonment of any secondary highway connecting with a private road easement. The complainants herein do not own property abutting on either the 30-foot private road easement or Route 630. They certainly have no property rights in Route 630.

The discretionary power to make the determination in question is vested in the legislative department of the government. A court cannot control or revise such a decision on the ground of inexpediency, injustice, or impropriety. Nor may it inquire into the motives of the tribunal where there is no allegation of fraud, or where it is not manifest that a flagrant wrong has been perpetrated upon the public and that valuable rights have been surrendered, ostensibly for the public good, but really for the benefit of private individuals. Merely because the County of York sought the defendant's industry does not constitute evidence that the abandonment of Route 630 was solely for the benefit of Amoco. The presence of such an industry in the area is generally acknowledged to be of material benefit to a county and the public good is indeed paramount.

■ Undoubtedly Route 630 "served" many citizens prior to its abandonment. If the Board is required to exercise more than reasonable discretion, it would carry with it an inference that any citizen could complain. Residents of the Dandy and Hornsbyville areas could protest that, in order to reach Waterview, they are required to travel a slightly longer distance than heretofore provided by Route 630. The wording of the statute providing that a new road "which serves the same citizens as the old road" must be liberally construed to permit discretionary action by the Board. Serving "the same citizens", in the absence of a way of necessity, would apparently bring into focus the rights of the traveling public and the abutting landowners.

■ As complainants are not abutting landowners, it is difficult to conceive how any special injury may be shown, as contrasted with an injury to the general public. Unless such special injury is established, only the public

authorities may abate any public nuisance brought about by the obstruction of a public highway. The difference between the injury to an individual and the injury to the public must be one of *kind* and not one of *degree*. In Bowe v. Scott, 113 Va. 499, 75 S.E. 123, the Supreme Court of Appeals, in an opinion by Justice Whittle, had before it a situation which closely resembles the facts here presented. The City of Richmond adopted an ordinance closing, for a period of thirty years, a portion of a public alley extending from Shafer Street to Harrison Street to the extent that said alley bisected the lots of the parties requesting the closing of said alley. Bowe and others, as owners of property abutting on that portion of the alley *not* closed, sought to enjoin the closing of any portion of the alley as the same offered a means of access to and from their lots. The effect of the closing prohibited Bowe from traversing the entire length of the alley from Shafer Street to Harrison Street, although he could still use the remaining portion of the alley as an access to Harrison Street. The Court properly held that any special and peculiar damage must be direct, and not purely consequential, and must be different in kind, and not merely in degree, from that sustained by the community at large. As the lots of the complaining parties, did *not* abut on the section of the alley closed, such special and peculiar damage did not exist and the demurrer to the bill of complaint was sustained. This authority is very much in point; the only distinction being that the alley in Bowe v. Scott, supra, was public, whereas the 30-foot road easement was private. However, as we are considering the rights, if any, of the complainants herein in Route 630, it would appear that this is, in reality, a distinction without a difference. See also Magee v. Omansky, 187 Va. 422, 46 S.E.2d 443.

It is urged that there is a material distinction between "abandoning" a public highway and "closing" same after it has been abandoned. Under § 33-76.10 of the Code of Virginia 1950, the effect of abandonment is set forth:

> "In case of the abandonment of any section of road or any crossing under the provisions of this article as a part of the secondary system of highways, such section of road or such crossing, shall not remain a public road or crossing."

As the "article" referred to in the foregoing section also includes the "alternative procedure for abandonment" [3] it follows that if Route 630 was legally abandoned, it no longer remained a "public road". Reliance is placed upon Hiner v. Wenger, 197 Va. 869, 91 S.E.2d 637, wherein the Board of Supervisors, with the approval of the State Highway Commissioner, abandoned, without legal proceedings instituted under § 33-76.8 and with no evidence of the construction of a new road, a small section of a secondary highway. The Court pointed out that the resolution of the Board and the letter from the Highway Commissioner was conclusive upon the court that no public necessity existed for the expenditure of any public funds for the repair and maintenance of that portion of the highway but, disagreeing with complainants, it does not appear that the court intended to distinguish between "abandonment" and "closing" as related to the purposes of use. At the most the court merely held that the action of the Board and Highway Commissioner conclusively established that no public necessity existed for the expenditure of highway funds. It in no sense affects a legal abandonment of "use" under the statute. It may well be argued that the language of the Court in Hiner v. Wenger, supra, is authority for Amoco's contention that the action of the Board in the instant case in declaring and finding that the new road serves "the same citizens as the old road" is conclusive and binding upon the Court.

---

3. Acts of Assembly 1950, Article 6.2, pp. 733, 734.

█ Upon the legal abandonment of a secondary highway such as Route 630, what then happens to the highway? In Basic City v. Bell, 114 Va. 157, 76 S.E. 336, 338, it is said: "Once a highway, always a highway", unless it is abandoned or vacated in due course of law. In a strict sense, there is a distinction between "vacation" and "abandonment"; the former term being customarily used to describe the termination of the existence of a highway by direct action of the public authorities; the latter carrying a suggestion of loss or abandonment of the public right by nonuser. 25 Am.Jur., "Highways", § 117. But as effectively pointed out in Bond v. Green, 189 Va. 23, 52 S.E.2d 169, 172, 173, the technical distinction between "vacation" and "abandonment" is not always observed in drafting statutes dealing with highways. In considering to whom the title to the land embraced in the abandoned road would revert, the court commented:

"The general rule is that on the condemnation or dedication of land for use as a public highway, the public acquires only an easement in the land condemned or dedicated. The fee remains in the owner subject to the right of passage. [Citing authorities.]

"When a highway is discontinued or abandoned, the land used for that purpose immediately becomes discharged of the servitude and the absolute title and right of exclusive possession thereto reverts to the owner of the fee, without further action by the public or highway authorities. In the absence of evidence to the contrary, the fee is presumed to be in the abutting land owners. If the highway is the boundary line between different tracts, the presumption is that the reversion to each owner is to the center of the highway."

At the time of the abandonment of the several sections of Route 630, Amoco was the sole abutting landowner. While it is true that, subsequent to abandonment, the County of York and Commonwealth of Virginia quitclaimed to Amoco, the owner of the fee, any and all interest they may have had in the land embraced within the abandoned sections, this was an unnecessary act, unless perhaps the fee title was actually vested in one of the governing authorities.

This leads to a consideration of the legality of an abandonment proceeding where private and public interests are concerned. In City of Lynchburg v. Peters, supra, it is said [145 Va. 1, 133 S.E. 677]:

"It is well settled in Virginia and elsewhere that a city has no authority to divert public streets or any part thereof to the exclusive use of private interests. Norfolk City v. Chamberlaine, 29 Grat. [534] 539, 70 Va. [534] 539; City of Richmond v. Smith, 101 Va. 161, 43 S.E. 345; Smith v. McDowell, 148 Ill. 51, 35 N.E. 141, 22 L.R.A. 393."

The history of Amoco's acquisition of the land area and its subsequent construction of a refinery representing an approximate investment of $35,000,000 reveals that Standard Oil Company of New Jersey had originally contemplated locating a refinery at the present location, or at the Craney Island section near Portsmouth, Virginia. Amoco contacted Standard and expressed an interest in whichever location Standard did not select. While awaiting Standard's decision, Amoco formulated plans to construct its refinery in New Jersey. At the instance of the Peninsula Industrial Commission and after some preliminary investigation, Amoco decided to hold in abeyance its New Jersey site plans and, in due time, Standard determined to forego its York County plans. On August 20, 1953, the Board of Supervisors adopted a resolution to the effect that, if Amoco would show bona fide evidence of building the refinery, the Board would take the necessary steps to abandon the roads essential for the construction and maintenance of an integral refinery site. This brought about the execution of a tripartite agreement, dated September

1, 1954, between Amoco, the Board of Supervisors, and the Commonwealth of Virginia, Department of Highways. The first preamble contained in said agreement reads:

"Whereas, the Corporation (Amoco) has acquired certain property on York River and Back Creek in the Goodwyn's Neck Area, York County, Virginia, and proposes to develop said property and establish and maintain thereon certain works and operations, which will be of benefit to the Commonwealth, and particularly to the said County and the areas adjacent thereto and in the vicinity thereof * * * "

Thereafter follow the details relative to the abandonment of certain roads and other matters not pertinent for consideration herein.

From the foregoing recital and the evidence adduced, it is apparent that both the Commonwealth and County were cognizant of the many benefits accruing to the public by reason of the construction and operation of an oil refinery of such magnitude. By the same token it must be conceded that the ultimate "use" of the abandoned roads was contemplated to be exclusively for private interests, i. e., Amoco.

City of Lynchburg v. Peters, supra, was decided prior to the adoption of the abandonment statutes and the authority to permanently close its streets was upheld by its charter, when construed with a general statute in Virginia which provided:

"Every city and town shall have power to lay off streets, walks, or alleys; alter, improve, and light the same, and have them kept in good order." Code Va.1919, § 3030.

The motive which actuated the Board of Supervisors of York County and the Department of Highways to abandon or vacate Route 630 and cause the construction of Route 173 to "serve the same citizens" is not open to judicial review. This motive was undoubtedly to bring Amoco into the area. "Motive" is that which prompts the choice or moves the will, thereby inciting or inducing action, while "purpose" is that which one sets before himself as the end, aim, effect or result to be kept in view or object to be attained. City of Kirkwood v. Venable, 351 Mo. 460, 173 S.W.2d 8; Kessler v. City of Indianapolis, 199 Ind. 420, 157 N.E. 547, 53 A.L.R. 1, 7. The purpose with respect to the abandonment or vacation of Route 630 was to permit an alteration of the same and a new road to be constructed in lieu thereof "serving the same citizens as the old road". In 25 Am.Jur., "Highways," § 119, pp. 416–418, it is said:

"Whether a highway may or should be vacated, or discontinued, is determined primarily by considerations of its necessity or public utility. Generally, a highway can be vacated only when the public authorities determine that it is no longer required for the public use or convenience, and that there is a public necessity for its vacation, or that it is for the public benefit that such action be taken, either by avoiding the expense of maintaining a street or highway which is no longer useful to the public, or by laying out a new way in its place which will be more useful and convenient."

The public sufficiency of the new road was properly a matter for consideration by the Board, subject to the approval of the State Highway Commissioner. There is ample reason to conclude that the public interest would be subserved and, as such, the legality of the abandonment should be sustained. People ex rel. v. Benson, 294 Ill. 236, 128 N.E. 387; People ex rel. v. Atkins, 295 Ill. 165, 128 N.E. 913; People ex rel. v. Elgin, 298 Ill. 574, 132 N.E. 204. In Elliott on Roads and Streets, 4th Ed., Vol. 2, § 1183, p. 1685, the author states:

"The presumption should be in favor of good faith and right acting, and the mere fact that the vacation results in private benefit neither shows fraud nor abuse of dis-

cretion, for it usually happens that some one is benefited more than the general public and at the same time it may be better for the general public to have the highway vacated, especially where it is not of public utility, or is a useless expense, or the like. This is usually for the local authorities to determine in their discretion."

The author of the foregoing quotation could readily have added a comment to the effect that where a new road is constructed serving the same citizens as the old road, private benefits may be the ultimate result of such action.

■ Despite the quoted language in City of Lynchburg v. Peters, supra, which is by way of dicta, it is not the belief of this Court that the Supreme Court of Appeals of Virginia intended to foreclose the possibility of the lawful abandonment of one highway, when another and more adequate highway serving the same citizens as the old road is constructed, merely because the ultimate exclusive use may be for a private interest.

It will be noted that § 33–76.12 of the Code of Virginia makes no provision for a finding that some "public utility" or "public interest" must be served by any abandonment or vacation. The essential findings are:

(1) That the road be altered;

(2) That a new road be constructed in lieu thereof;

(3) That the new road serve the same citizens as the old road; and

(4) That approval of the State Highway Commissioner be obtained.

The ultimate use of Route 630 after abandonment may well have resulted in a benefit to Amoco, but the motive and purpose were not exclusively for private interests. Under the tripartite agreement, the Commonwealth acquired the fee simple title to a strip of land 80 feet in width, as contrasted with the 30 foot easement of passage it had in Route 630. Such is a potent factor in determining whether there was any benefit to the public in vacating Route 630. The private use of former Route 630 is an incident to the abandonment as Amoco is the abutting landowner, but the public purpose lies in the construction of a new and more adequate road serving the same citizens. Certainly it would not be in the public interest to maintain both the old and new roads.

Concluding that there are no genuine issues as to any material facts presented, the defendant's motion for summary judgment must be granted.

Little need be said as to defendant's motion to dismiss the complaint as to Margaret E. Moore. As successor in title to the Pohlig interests, she conveyed all of her property south of Waterview Road and "all of her right, title and interest" in and to the 30 foot road, as well as "in all roads or ways, public or private and any and all easements and property rights of any kind and nature whatsoever". This deed is dated December 12, 1953, and represents her conveyance to Pan-Am. She still retains title to a parcel of land north of Waterview Road on the York River side. Over objection which the Court took under advisement, this complainant was permitted to testify that she did not intend to convey her interest in the 30-foot private road easement, other than as to such property which was conveyed to Pan-Am and located on the south side of Waterview Road.

The deed in question is clearly free from ambiguity. True, the deed was prepared by Amoco's attorney and complainant was not represented by counsel although she conferred with her son-in-law prior to the execution thereof. No fraud or false representations are alleged or proven. The objection to complainant's evidence must be sustained and the action dismissed as to her. Hamlin v. Pandapas, 197 Va. 659, 90 S.E.2d 829. The language of the instrument is clear and unambiguous. It speaks for itself and there is nothing to construe.

In accordance with this opinion an order will be prepared by counsel for de-

fendant granting the motion to dismiss as to Margaret E. Moore, and the motion for summary judgment as to all complainants, thus dismissing this action. After presentation to counsel for complainants for inspection, the order shall be transmitted to the Court for entry.