**Ruth Pendleton JAMES, a minor, etc.,
et al., Plaintiffs,**

v.

**J. Lindsay ALMOND, Jr., Governor of
Virginia, et al., Defendants.**

Civ. A. No. 2843.

United States District Court
E. D. Virginia,
Norfolk Division.

Jan. 19, 1959.

---

Edmund D. Campbell, Arlington, Va., and Archie L. Boswell, Norfolk, Va., for plaintiffs.

A. S. Harrison, Jr., Atty. Gen., Walter E. Rogers, Richmond, Va., Leonard H. Davis, City Atty., Norfolk, Va., for the City of Norfolk, Va., Leigh D. Williams, and W. R. C. Cocke, Norfolk, Va., for defendants.

Before SOBELOFF and HAYNSWORTH, Circuit Judges, and HOFFMAN, District Judge.

PER CURIAM.

In this action for a preliminary and permanent injunction certain children of the white race, together with their parents, seek to restrain the enforcement, operation and execution of Sections 22–188.3, 22–188.4, 22–188.5, 22–188.6, 22–188.7, 22–188.8, 22–188.9, 22–188.10, 22–188.11, 22–188.12, 22–188.13, 22–188.14, and 22–188.15 of the Code of Virginia, 1950, as amended by the Acts of Assembly, Extra Session, 1956, and the Acts of Assembly, 1958. The statutes in question have been referred to by counsel as the "massive resistance" laws. As stated by defendants in their brief, the statutes are all a part of an overall effort or plan of the General Assembly to deal with the problems created by the decision of the United States Supreme Court in Brown v. Board of Education of Topeka, Shawnee County, Kan., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and its impact upon the social, economic, and political conditions existing in Virginia as related to the children of this state.

The defendants are the Chief Executive and the Attorney General of the Commonwealth of Virginia, as well as the individual members of the School Board of the City of Norfolk, the Division Superintendent of Schools, and the School Board of the City of Norfolk, Virginia, a body corporate.

As injunctive relief is sought against certain officers of the state, a three-judge district court was convened pursuant to 28 U.S.C. §§ 2281, 2284.

The background of this litigation may be obtained by a casual reference to certain documents introduced in evidence and a study of the proceedings in the case of Beckett v. School Board of City of Norfolk, Virginia, Civil Action No. 2214, which has been pending in this court since May, 1956, and in which numerous orders have been entered and appeals taken [1]. Subsequent to the decision of the United States Supreme Court in Brown v. Board of Education, supra, the Report of the Commission on Public Education was submitted to the Governor

---

[1]. The officially reported opinions in Beckett v. School Board of City of Norfolk, Virginia (Adkins v. School Board of City of Newport News) are as follows:

(a) D.C., 148 F.Supp. 430—an opinion by District Judge Hoffman holding the Pupil Placement Act (Chapter 70, Acts of Assembly, Extra Session, 1956) unconstitutional on its face.

(b) School Board of City of Newport News, Virginia v. Atkins, 246 F.2d 325—An opinion by the United States Court of Appeals for the Fourth Circuit affirming the action of the district judge in ruling the Pupil Placement Act unconstitutional, and in enjoining the defendants from discriminating, solely on account of race or color, in admitting, as-signing, or enrolling children to the public schools of the City of Norfolk.

(c) 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed. 2d 63—The United States Supreme Court denied a writ of certiorari in the aforesaid case.

(d) School Board of City of Norfolk v. Beckett, 260 F.2d 18—The United States Court of Appeals for the Fourth Circuit affirmed the action of District Judge Hoffman in declining to grant a further delay of one year, as requested by the School Board, to comply with the order of the district court previously entered on February 26, 1957, enjoining the School Board from discriminating solely by reason of race or color.

of Virginia on November 11, 1955. This Report, as well as Senate Joint Resolution No. 3 known as the "Interposition Resolution" and the Governor's address to the General Assembly of Virginia at its Extra Session of 1956, have been fully discussed in Beckett v. School Board of City of Norfolk, Virginia, D.C., 148 F.Supp. 430, and need not be repeated. It is sufficient to state that the Report of the Commission on Public Education, referred to as the "Gray Report", was not adopted by the General Assembly. Thereafter, in the Inaugural Address of the present Governor of Virginia delivered on January 11, 1958, it was stated that no integration would be permitted in Virginia. While these documents are of no great moment in the final determination of the issues now before the court, they were admitted in evidence as a part of the legislative history for the purpose of ascertaining the legislative purpose and intent. National Association for Advancement of Colored People v. Patty, D.C., 159 F.Supp. 503; Beckett v. School Board of City of Norfolk, Virginia, supra, and authorities cited therein.

At the conclusion of the numerous proceedings and appeals in Beckett, the matter was again before the district court on the individual applications of 151 Negro children for admission into public schools previously attended solely by white children. The School Board initially denied all applications for admissions as filed by Negro children, assigning as reasons for such action that (1) the presence of one or two Negro children among a large number of white pupils would create among the Negroes an injurious "sense of isolation," (2) the peculiar circumstances would involve

"racial conflicts and grave administrative problems," (3) many of the applicants were scholastically not eligible for considerations of transfer, and (4) as to a limited few Negro pupils, while otherwise qualified, they would be subjected to another transfer in September, 1959, because of a new school to be constructed in the area and "too frequent" transfers are not conducive to proper education. The district judge upheld the Board's reasoning in denying requests for transfer as to pupils classified in the latter two groups, but held that a "feeling of isolation" and "possible racial tension" did not constitute sufficient legal grounds to deny admission to the children otherwise qualified. The Board was then requested to reconsider all of the applications and report to the court; the district judge at all times refraining from making any specific assignments. The members of the School Board, acting in compliance with the law of the land as construed by the United States Supreme Court and as fully explained to them by the district judge, finally reported that seventeen Negro children *would be* assigned to certain public secondary schools of the City of Norfolk which had previously been attended only by children of the white race [2]. On September 27, 1958, following an affirmance of the order of the district court by the United States Court of Appeals for the Fourth Circuit (260 F.2d 18), at a special session of the latter court that day held at the request of the School Board, the Board assigned the seventeen Negro children to the schools in controversy, and thereupon the Governor of Virginia, purporting to act under § 22–188.5 of the Code of Virginia, issued a proclamation [3] declaring the affected schools closed; divesting the

2. The secondary schools affected by this action, and the number of Negro children assigned to each school, are as follows:

| | |
|---|---|
| Maury High School | 1 Negro child |
| Granby High School | 1 Negro child |
| Norview High School | 7 Negro children |
| Northside Junior High School | 1 Negro child |
| Blair Junior High School | 2 Negro children |
| Norview Junior High School | 5 Negro children |

3. The body of the letter from the Governor to the School Board, its individual members, and the Division Superintendent, is quoted:

"Under compulsion of an order issued by the United States District Court for the Eastern District of Virginia, both white and colored children have been enrolled effective September 29, 1958, in

School Board of all authority, power and control over said schools; and assuming as Governor complete authority, power, and control over the schools, its principals, teachers, employees, and pupils enrolled or ordered to be enrolled therein, including the infant plaintiffs, each of whom is a white child enrolled or ordered to be enrolled in one of said schools.

As the opening of all public schools in the City of Norfolk had been postponed by action of the School Board until September 29, 1958, in order to obtain a final ruling from the United States Court of Appeals for the Fourth Circuit, the six schools referred to have never opened for the 1958–59 school year. Since September 27, 1958, the only activity permitted has been such as was specifically authorized by the Governor[4]. Approximately 42,000 pupils were enrolled in all public schools in Norfolk prior to the enforcement of the school-closing laws which are the subject of this litigation. Of this number, an estimated 9,900 would have been enrolled in the six schools. No high schools heretofore attended solely by white children are in operation. Three of the four junior high schools formerly attended solely by white children are closed, and the only junior

high school in this class remaining open is operating on a segregated basis in excess of its normal capacity. The schools previously and now attended only by Negro children are in full operation, also on a segregated basis, but the seventeen Negro children are not in attendance at any school.

What has happened to the 9,900 white children in the interim? Between 4,200 and 4,500 children are enrolled in various tutoring groups being held in private homes and churches, where they are receiving stopgap instruction in certain basic courses under the guidance of teachers; ninety percent of whom are public school teachers under contract to teach in the six closed schools and whose contractual obligations have purportedly been assumed by the State pursuant to § 22–188.14 of the Code of Virginia, 1950, as amended[5]. There have been 1,621 children officially transferred to other recognized schools, public or private; but the number leaving the state is presently unknown. Approximately 948 children have been transferred to the public schools of South Norfolk, a city contiguous to Norfolk, where the vast majority attend a session beginning at 4 P.M. each day. It is estimated that between 2,500 and 3,000 children are re-

---

Granby, Maury and Norview High Schools and Blair, Northside and Norview Junior High Schools, located in the City of Norfolk.

"Pursuant to the provisions of Chapter 9.1, Title 22, of the Code of Virginia, the above-named schools are closed and are removed from the public school system, effective September 29, 1958, and all authority, power and control over such schools, principals, teachers and other employees and all pupils now enrolled or ordered to be enrolled, will thereupon be vested in the Commonwealth of Virginia, to be exercised by the Governor.

"Accordingly, by virtue of the authority vested in me as chief executive of the Commonwealth of Virginia, I will thereupon assume all power and control over such schools and hereby request all local officials and all citizens to cooperate with the Department of State Police and local law enforcement officials in the pro-

tection of public property and the security of public peace and order.

"You are requested to forthwith notify all teachers, and other personnel connected with such schools, and all parents and other persons having custody and care of all pupils enrolled in such schools, of this action.

"Given under my hand this 27th day of September, 1958.

"/s/ J. Lindsay Almond, Jr.
"Governor."

4. The Governor has granted authority to conduct althletic programs in the name of, and at, said schools. He has further permitted non-educational uses of the school properties for meetings, etc.

5. The School Board of the City of Norfolk has already requested payment from the State in the sum of $462,708, covering contractual obligations incurred for the months of September and October. As of the date of argument the State had paid nothing on this obligation.

ceiving no education or tutoring of any nature.

The plight of the school children and the teaching personnel who would have been in attendance at the six schools has been adequately described as "tragic." Children who would be in their last year of high school are at a loss as to what to do, and those who had planned to attend college are completely frustrated. The value of a high school diploma is freely recognized, even as to such children who may be admitted to college on examination and without a diploma. Children not having reached the twelfth grade are equally uncertain as to their future. While the record does not reflect the reaction of the children attending other public schools in Norfolk now in operation, it is a proper assumption that at least some of these students and their parents must realize that their schools could be closed at any moment.

In this state of confusion the teachers under contract in the closed schools have endeavored to assist as a temporary measure. But they likewise must look to the future. The morale is at a low ebb; they do not know when, if ever, they will resume the noble profession of educating the youth of Virginia, to which they have dedicated their lives. While their contracts are apparently protected until June 30, 1959, they have no assurance that their services will be renewed for the next succeeding school year. Aside from the financial remuneration they receive, the teachers express the desire to teach in public schools—not merely to assist in some private tutoring group. The testimony points to a feeling of unrest and insecurity among all of the teachers; they are here today, but they will undoubtedly be gone tomorrow unless they are assured with respect to the future. If the teachers leave for a more certain field of endeavor, the public of Norfolk will lose and, even if we were to assume that private tutoring groups would and could continue, the teaching source of supply would be so limited that only a scattered number of children could receive this type of education.

In this setting we approach the statutes under consideration. The adult plaintiffs are all taxpayers and citizens of the Commonwealth of Virginia. With the exception of four adult female plaintiffs, all adult plaintiffs are taxpayers of the City of Norfolk. A portion of the public funds of the state derived from taxation of the adult plaintiffs and other citizens of Virginia is used and applied in the maintenance and operation of the free public school system of Virginia. It is unnecessary for us to discuss the rather complicated formula used by the state in determining the amount allocated for the purpose of public school education in each county and city throughout the state. In some counties the percentage of the total budget for public education received from the state will be as high as seventy percent. In the City of Norfolk the percentage of state contribution is slightly in excess of twenty-three percent. By reason of the large number of federally-connected children in Norfolk, the federal government contributes approximately twelve percent of the total budget of $10,354,406.

■ We are not unmindful of the difficulties confronting Virginia and other Southern States following the Brown decision of May 17, 1954. It is not for us to pass upon the wisdom of state legislation, but it is our duty to apply constitutional principles in accordance with the decisions of the United States Supreme Court, and when state legislation conflicts with those constitutional principles, state legislation must yield. Irrespective of what may be said by those in public life, we are gratified to note that counsel for the defendants, including the Attorney General of Virginia, concede that the decisions of the United States Supreme Court are not only binding upon this court, but also constitute the law of the land. If there ever existed any room for doubt as to the controlling force of the principles of law enunciated in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Id., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, these doubts were effectively removed

when, on September 29, 1958, the Supreme Court handed down its opinion in Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5, wherein Brown was expressly and unanimously reaffirmed.

In Cooper v. Aaron, supra, we find the following apt statement:

"It is, of course, quite true that the responsibility for public education is primarily the concern of the States, but it is equally true that such responsibilities, like all other state activity, must be exercised consistently with federal constitutional requirements as they apply to state action. The Constitution created a government dedicated to equal justice under law. The Fourteenth Amendment embodied and emphasized that ideal. *State support of segregated schools through any arrangement, management, funds, or property cannot be squared with the Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws. The right of a student not to be segregated on racial grounds in schools so maintained is indeed so fundamental and pervasive that it is embraced in the concept of due process of law.*" (Emphasis supplied)

 Tested by these principles we arrive at the inescapable conclusion that the Commonwealth of Virginia, having accepted and assumed the responsibility of maintaining and operating public schools, cannot act through one of its officers to close one or more public schools in the state solely by reason of the assignment to, or enrollment or presence in, that public school of children of different races or colors, and, at the same time, keep other public schools throughout the state open on a segregated basis. The "equal protection" afforded to all citizens and taxpayers is lacking in such a situation. While the State of Virginia, directly or indirectly, maintains and operates a school system with the use of public funds, or participates by arrange-

ment or otherwise in the management of such a school system, no one public school or grade in Virginia may be closed to avoid the effect of the law of the land as interpreted by the Supreme Court, while the state permits other public schools or grades to remain open at the expense of the taxpayers. In so holding we have considered only the Constitution of the United States as it is unnecessary, in our opinion, to pass upon the specific provisions of the Constitution of Virginia which deal directly with the free public school system of the state. We do not suggest that, aside from the Constitution of Virginia, the state must maintain a public school system. That is a matter for state determination. We merely point out that the closing of a public school, or grade therein, for the reasons heretofore assigned violates the right of a citizen to equal protection of the laws and, as to any child willing to attend a school with a member or members of the opposite race, such a school-closing is a deprivation of due process of law. It follows, therefore, that the defendants must be permanently enjoined from enforcing or attempting to enforce the statutes in question as the same may apply to the public schools of the City of Norfolk.

We need only turn back the pages of history to 1899 to find authority for our statement that these plaintiffs are being denied the equal protection of the laws. When we examine Cumming v. Board of Education of Richmond County, 175 U.S. 528, 542–545, 20 S.Ct. 197, 201, 44 L.Ed. 262, and interpret the same in light of the more recent Brown and Cooper cases, we find abundant reasoning for our conclusions. The Cumming case arose in *Georgia* where a Board of Education, having previously maintained a public high school for the benefit of sixty colored children, elected temporarily to do away with the particular high school and operate, in its stead, a primary school serving three hundred Negro pupils who would otherwise be without the benefit of an education. The evidence disclosed that the Board was without the necessary

funds to operate both schools, and that its action in suspending *temporarily* and for *economic* reasons was not a denial of the equal protection of laws. In affirming the Supreme Court of Georgia, Mr. Justice Harlan, speaking for the United States Supreme Court, had this to say:

"We may add that while all admit that the benefits and burdens of public taxation must be shared by citizens without discrimination against any class on account of their race, the education of the people in schools maintained by state taxation is a matter belonging to the respective states, and any interference on the part of Federal authority with the management of such schools cannot be justified *except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land.*" (Emphasis supplied)

In the instant proceeding the six schools are closed solely because of resistance to the law of the land as interpreted by the United States Supreme Court. The underlying reason is, of course, the mixing of races in these schools by the School Board's assignment of seventeen Negro children into schools previously attended only by white pupils. The plaintiffs thereupon became a class created by reason of the operation of the massive resistance statutes. They, together with the seventeen Negro children, are the subjects of discrimination and are unable to obtain the benefits of public taxation on the same basis as the parents of other children similarly situated. The statutes and the action of the defendants thereunder manifestly constitute a clear and unmistakable disregard of rights secured by the Fourteenth Amendment to the Constitution.

In the event the State of Virginia withdraws from the business of educating its children, and the local governing bodies assume this responsibility, the same principles with respect to equal protection of laws would be controlling as to that particular county or city. While the county or city, directly or indirectly, maintains and operates a school system with the use of public funds, or participates by arrangement or otherwise in the management of such a school system, no one public school or grade in the county or city may be closed to avoid the effect of the law of the land while other public schools or grades remain open at the expense of the taxpayers. Such schemes or devices looking to the cutoff of funds for schools or grades affected by the mixing of races, or the closing or elimination of specific grades in such schools, are evasive tactics which have no standing under the law.

We cannot agree with defendants' argument that the closing of these schools constitutes a "temporary" delay in operation. Defendants presented no evidence and did not suggest when, if ever, the schools would be reopened, or as to what steps, if any, were being taken by the Governor to accomplish this purpose. Indeed, Chapter 68 of the Acts of Assembly, Extra Session, 1956, as amended by the Acts of Assembly, 1958, provides that any school in which children of both races are enrolled shall be closed and shall not be reopened as a public school until, in the opinion of the Governor and after investigation by him, he finds and issues an executive order that (1) "the peace and tranquility of the community in which the school is located will not be disturbed by such school being reopened and operated," *and* (2) "the assignment of pupils to such school could be accomplished without enforced or compulsory integration of the races therein contrary to the wishes of any child enrolled therein, or of his or her parent or parents, lawful guardian or other custodian." Code of Virginia, 1950, as amended, § 22–188.6. If we were to assume the validity of this statute, it would certainly be chimerical to conclude that the Governor could ever order a reopening of any of the six schools where an effective objection may be registered by any one parent of a child scheduled to attend the school in question. There are a large number of Virginians who are determined that

here shall be no mixing of races in public schools under any circumstances, and who cannot be expected willingly to comply with the anti-discrimination rule established by the 1954 decision of the United States Supreme Court. (To anticipate that there would be no objection on the part of any parent to the operation of an integrated school would require us to completely disregard what everyone knows to be the fact.) To postpone the reopening of a school until the end of all opposition to racial mixing cannot possibly be regarded as a temporary measure.

Nor is any relief afforded by § 22–188.2 of the Code of Virginia, 1950, as amended, wherein it is provided that the closed school or schools shall become a part of the public school system of the political subdivision in which the school is located upon a certificate of the school board *and* board of supervisors of the county or council of the city. It should be noted that this statute, as originally enacted in 1956, made it *mandatory* upon the Governor to proclaim the closed school as a part of the public school system of the political subdivision upon certification of *either* the school board *or* the local governing body. The amendment to this statute in 1958 effectively closed the door when it vested in the Governor the *discretion* to make the necessary proclamation by changing the wording "shall so proclaim" to "may so proclaim" and by further providing that *both* the school board and the governing body of the county or city must join in the certificate addressed to the Governor. Aside from the 1958 amendment, the statute clearly violates the rights of citizens under the equal protection provision of the Fourteenth Amendment. It directly violates the statement in Brown where it is said:

"Such an opportunity [of an education], where the state has undertaken to provide it, is a right which must be made available to all on equal terms [347 U.S. 483, 74 S.Ct. 691]."

We are told that, because the schools are closed to *all alike*, both white and colored, there is no discrimination and hence there is no violation of the Fourteenth Amendment. This premise is totally unsound. The discrimination here complained of is the denial of the right of white children to attend public schools which are closed by action of the Governor pursuant to an unconstitutional law enacted by the General Assembly of Virginia, while other white children living in the same state, and within the same political subdivision, are enjoying the educational opportunities afforded them at the expense of all taxpayers, including the parents of the white children locked out of the six schools. We need hardly discuss the factor of race to arrive at the conclusion that this is not equal protection of laws. Equality of treatment is not achieved through indiscriminate imposition of inequalities. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161. As was said in Henderson v. United States, 339 U.S. 816, 825–826, 70 S.Ct. 843, 847, 94 L.Ed. 1302:

"Discriminations that operate to the disadvantage of two groups are not the less to be condemned because their impact is broader than if only one were affected."

Where a state or local government undertakes to provide public schools, it has the obligation to furnish such education to all in the class eligible therefor on an equal basis. State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208. As the United States Supreme Court has ruled out any classification by race as a condition of eligibility, it follows that all eligible children must be accorded equal treatment with respect to admission or attendance in public schools, subject to reasonable rules and regulations disassociated with racial questions. The plaintiffs herein, and the class they represent, are not being accorded education on an equal basis.

The defendants have filed motions to dismiss this action which require our attention.

The first contention is that this is an action against the Commonwealth of Virginia and, therefore, cannot be maintained by reason of the provisions of the Eleventh Amendment to the Constitution of the United States which prescribes:

"The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Despite the wording of the amendment, it has been held that the federal courts are without power to entertain a suit by a citizen of a particular state when instituted against the state of the plaintiff's citizenship. Hans v. State of Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842; Fitts v. McGhee, 172 U.S. 516, 524, 19 S.Ct. 269, 43 L.Ed. 535; Duhne v. State of New Jersey, 251 U.S. 311, 313, 40 S.Ct. 154, 64 L.Ed. 280; Ex parte State of New York, 256 U.S. 490, 41 S. Ct. 588, 65 L.Ed. 1057.

Defendants readily concede that state officials, including the Governor and Attorney General, are not immune from suit brought to *prevent* their acting under color of authority, purported to be given to them by an unconstitutional enactment, in such a manner as to infringe the constitutional right of individuals. Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375; Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714; United States v. Lee, 106 U.S. 196, 1 S. Ct. 240, 27 L.Ed. 171; Philadelphia Co. v. Stimson, 223 U.S. 605, 620, 32 S.Ct. 340, 56 L.Ed. 570; Ferris v. Wilbur, 4 Cir., 27 F.2d 262; Orleans Parish School Board v. Bush, 5 Cir., 242 F.2d 156, 160; School Board of City of Charlottesville v. Allen, 4 Cir., 240 F.2d 59. Defendants cite in support of their contention a line of authorities such as Ex parte Ayers, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216; Hagood v. Southern, 117 U.S. 52,

6 S.Ct. 608, 29 L.Ed. 805; Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121; Kennecott Copper Corp. v. State Tax Commission, 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862; Mine Safety Appliances Co. v. Forrestal, 326 U.S. 371, 694, 66 S.Ct. 219, 90 L.Ed. 140; Ford Motor Co. v. Department of Treasury of State of Indiana, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389; Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628; State of Minnesota v. Hitchcock, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954; O'Neill v. Early, 4 Cir., 208 F.2d 286; and Fleming v. Upper Dublin Public School District, D.C., 141 F.Supp. 813. We have reviewed these cases and find that affirmative state action was held to be required in each instance. The language in Ex parte Ayers must be considered in conjunction with the later case of Ex parte Young. In the Annotated Constitution of the United States of America, published pursuant to Senate Joint Resolution 69, approved June 17, 1947, 61 Stat. 133, we find (p. 933):

"What remained of the distinction as a limitation upon suits against State officials was dispelled by Ex parte Young, which not only sustained an injunction restraining State officials from exercising their discretionary duties but also upheld the authority of the lower court to enjoin the enforcement of the statute prior to a determination of its unconstitutionality. While Ex parte Ayers and Fitts v. McGhee were not overruled, the inevitable effect of the Young case was to abrogate the rule that a suit in equity against a State official to enjoin discretionary action is a suit against the State, and to convert the injunction into a device to test the validity of State legislation in the federal courts prior to its interpretation in the State courts and prior to any opportunity for State officials to put the act into operation.

"The rule of Ex parte Young applies equally to the governor of a

State in the enforcement of an unconstitutional statute. Continental Baking Co. v. Woodring, 286 U.S. 352 [52 S.Ct. 595, 76 L.Ed. 1155] (1932); Sterling v. Constantin, 287 U.S. 378 [53 S.Ct. 190, 77 L.Ed. 375] (1932)."

The test is correctly stated in the recent case of Board of Supervisors of Louisiana State University & Agricultural & Mechanical College v. Ludley, 5 Cir., 252 F.2d 372, 375, wherein an amendment to the Louisiana State Constitution specified certain state officials as "special agencies of the State of Louisiana," and withheld the consent of the State to be sued through any action against such officials. In holding that the suit was not one against the State, the court said:

"Full relief can be obtained from the named defendants without requiring the State to take any affirmative action. This is the test."

It would perhaps be sufficient to answer defendants' argument by referring to the second Brown decision, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, where it is said that all provisions of federal, state or local law requiring or permitting such racial discrimination in public education are unconstitutional and any such laws must yield to this principle. As the statutes in question effectively require a continuance of racial discrimination, they are patently unconstitutional. Aside from the foregoing, however, the short answer is that this court, while holding the statutes unconstitutional, is not directing the reopening of the schools. We merely hold that the Governor's proclamation of September 27, 1958, closing the schools was predicated upon an unconstitutional statute and hence is void. The injunction to be issued will simply prohibit the defendants, and all other persons in active concert or participation with defendants who receive or have notice or knowledge of the injunctive order, from in any manner, directly or indirectly, taking any steps in pursuance of the unconstitutional statutes here involved. The effect of this injunction will be tantamount to restoring to the School Board its rights, duties and obligations which existed prior to the enactment of the unconstitutional statutes, including, of course, its obligation to comply with the order of this court heretofore entered on February 26, 1957, in the Beckett case. The decree to be entered will not restrain the Commonwealth of Virginia in any sense of the word—it will only prevent the defendant state officials and others from endeavoring to enforce the package of unconstitutional laws designed for the purpose of defeating the "law of the land" as expressed in Cooper v. Aaron, supra [358 U.S. 1, 78 S.Ct. 1410].

What we have just said is abundant authority for denying the motion to dismiss the School Board as a party defendant, as well as holding that this is not an action against the Commonwealth of Virginia. The School Board may not attempt to enforce these unconstitutional acts any more than the Governor or Attorney General. Neither the Board, the other defendants, nor any persons in active concert or participation with defendants, including, of course, the local governing bodies, may resort to evasive schemes which are discriminatory or are designed to evade the court orders. The Board is clearly a proper and necessary party to the proceeding.

As to the motion to dismiss the Attorney General of Virginia, it is our view that he is also a proper party, although undoubtedly not what may be classified as a necessary party. He is the chief law enforcement officer of the Commonwealth. While he is given no specific statutory duties under the statutes in controversy, he is nevertheless charged with the enforcement of the laws of Virginia. To the end that there will be no misunderstanding of our ruling that the questioned statutes are unconstitutional as in violation of the Fourteenth Amendment to the Constitution of the United States, we conclude that the Attorney General is a proper party to this proceeding and should be included

within the terms of any injunctive decree to be entered.

An order has this day been signed by the resident judge directing a further hearing for the purpose of considering the form of decree to be entered in this cause.