Ruth Pendleton JAMES, a minor, etc., et al., Plaintiffs,

v.

W. Fred DUCKWORTH et al., Defendants.

No. 2892.

United States District Court
E. D. Virginia,
Norfolk Division.

Feb. 3, 1959.

Edmund D. Campbell, Arlington, Va., Archie L. Boswell, Norfolk, Va., for plaintiffs.

Leonard H. Davis, City Atty., W. R. C. Cocke, Leigh D. Williams, Norfolk, Va., for defendants.

WALTER E. HOFFMAN, District Judge.

This is another chapter involving the legal skirmishes confronting this and appellate courts following the May 17, 1954, decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, as the same applies to the public schools of the City of Norfolk[1]. To review the history of efforts to avoid the effect of the mandate in Brown would be needless repetition. The background of the

present controversy is fully disclosed by reference to the authorities cited in the footnote.

On January 19, 1959, the Supreme Court of Appeals of Virginia rendered its opinion in the case of Harrison v. Day, Va., 106 S.E.2d 636, declaring as violative of the Constitution of Virginia certain statutes enacted by the General Assembly of Virginia at its Extra Session, 1956, and its Regular Session of 1958. These statutes, among others, have generally been referred to as the "massive resistance laws". On the same day, January 19, 1959, a three-judge district court, convened pursuant to 28 U.S.C. §§ 2281–2284, released its opinion in James v. Almond, D.C., 170 F.Supp. 331, holding certain statutes enacted by the General Assembly of Virginia as in violation of the Fourteenth Amendment to the Constitution of the United States. The highest court of Virginia, having determined that the statutes were in violation of the State Constitution, found it unnecessary to comment on the contended abridgement of rights guaranteed by the Fourteenth Amendment to the Constitution of the United States. The opinion of the three-judge statutory court dealt only with the statutes in light of the Fourteenth Amendment and left for state determination the matters touching the interpretation of the State Constitution.

An announcement from the Supreme Court of Appeals of Virginia on January 2, 1959, to the effect that its opinion in Harrison v. Day would be delivered on January 19, 1959, prompted the three-judge statutory court immediately to state that, in deference to the pending decision by the Supreme Court of Appeals of Virginia, the three-judge court would

1. For prior decisions of litigation in Norfolk, Virginia, arising out of the Brown holding, see: Beckett v. School Board of the City of Norfolk, D.C., 148 F. Supp. 430; Beckett v. The School Board of the City of Norfolk, 2 Race Rel.L. Rep. 337 (otherwise unreported); School Board of the City of Norfolk v. Beckett, 4 Cir., 246 F.2d 325; School Board of Newport News, Virginia v. Atkins, 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed.2d 63 (New-

port News and Norfolk cases considered together on application for certiorari); Beckett v. The School Board of the City of Norfolk, 3 Race Rel.L.Rep. 942–964 (otherwise unreported) School Board of City of Norfolk v. Beckett, 4 Cir., 260 F.2d 18; James v. Almond, D.C., 170 F. Supp. 331 (opinion by three-judge court filed January 19, 1959; injunctive decree entered January 23, 1959).

delay releasing its opinion in James v. Almond until the Virginia court had expressed its views on the subject. The press gave much publicity to these announcements and proceeded to speculate as to the results of the forthcoming decisions. It was the general concensus of opinion that the "massive resistance laws" would be declared unconstitutional by one or both of the judicial bodies. Arguments in both cases were heard during the latter part of November, 1958, and, even at that time, anyone versed in the knowledge of law was cognizant of the fact that the statutes in controversy could not possibly survive the test of equal protection of laws under the Fourteenth Amendment. The President of the Council of the City of Norfolk who testified in this case freely conceded that he was of the opinion the statutes would be declared void.

The present action, instituted by numerous minor children and their parents of the white race, requests a temporary and permanent injunction against the Council of the City of Norfolk, its individual members, the Treasurer of the City of Norfolk, the School Board of the City of Norfolk, the individual members of the School Board of the City of Norfolk and the Division Superintendent of Schools to enjoin the enforcement and intended enforcement of an ordinance and two resolutions adopted by the Council cutting off funds for the use of certain schools and grades. At the conclusion of the hearing on the temporary injunction, counsel for said plaintiffs conceded that there had been no showing to justify the issuance of an injunction against the School Board of the City of Norfolk, the individual members thereof, and the Division Superintendent of Schools. All

of the testimony points to the fact that whatever action was taken by the Council was independent of the express desires of the School Board. The School Board stands ready and willing to open and operate the public schools of the City of Norfolk in accordance with the law but, for reasons apparent from the history of the litigation and the action of the Council which is the subject of this particular controversy, the Board has been substantially deprived of all of its rights and powers granted to the School Board under the laws of the State of Virginia.

The essence of the complaint, after stating the relationship of the parties and the sundry resolutions or ordinances adopted by the Council, is to the effect that the Council and its members, in adopting and seeking to enforce the resolutions in question limiting the use of appropriations for the use of the public schools of Norfolk, have been and are now engaged in an evasive scheme designed to nullify the lawful orders of this court, and that such action will deprive the minor plaintiffs herein, whose parents are citizens and taxpayers of the City of Norfolk and State of Virginia, of the rights guaranteed to said minor plaintiffs under the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.

As required by the laws of Virginia and the Charter of the City of Norfolk, the defendant Brewbaker, in his capacity as Division Superintendent of Schools, prepared, with the advice of the School Board, an estimate of the amount of money needed during the next fiscal and calendar year for the support of the public schools of the City of Norfolk [2]. The

2. The Charter of the City of Norfolk provides for the submission of the proposed estimate or budget on or before the 1st day of October of each year. Section 109, Charter of the City of Norfolk. Action must be taken by the Council on the total budget, including the requested appropriations for all departments of the City, at least 30 days before the end of each fiscal year (the fiscal

year being the calendar year for the City of Norfolk). Section 68, Charter of the City of Norfolk. Apparently the voters of the City of Norfolk are deprived of the benefits provided under Section 22–125 of the Code of Virginia, 1950, as amended, which states that a petition of a certain number of qualified voters may cause the Judge of the Corporation Court, in his discretion, to order an

estimate was approved by the School Board prior to its submission to the City Manager for transmittal to the Council as the tax levying body. The estimate or budget was prepared and submitted under the assumption that all public schools in the City of Norfolk would be open and operating during the year 1959 although, at the time in question, six of Norfolk's secondary schools were closed because of the School Board's assignment of 17 Negro children to previously all-white schools, which brought into operation the now declared unconstitutional statutes enacted by the General Assembly.

Prior to consideration of the requested appropriation for public schools, the City Council on September 30, 1958, adopted a resolution directed to the Governor and General Assembly of Virginia requesting that the six secondary public schools, previously closed pursuant to a communication from the Governor dated September 27, 1958, be opened and operated under Chapter 69 of the Acts of the General Assembly, 1956, Extra Session [3]. The preamble of the resolution is pertinent to demonstrate the legislative purpose and intent of the City Council as of September 30, 1958, wherein it is said:

"Whereas, Section 129 of the Constitution of Virginia provides that the General Assembly shall establish and maintain an efficient system of public free schools; and

"Whereas, six of the seven secondary public schools of the City of Norfolk in which white children are taught have been closed by operation of law; and

"Whereas, it is the earnest desire of the Council of the City of Norfolk that all such secondary schools in the City of Norfolk should continue

to operate in order that none of the approximately ten thousand students should be delayed in securing the education prescribed and provided by law for them; and

"Whereas, all of the secondary schools in which colored children are taught are in full operation; and

"Whereas, it is necessary for the immediate preservation of the public peace, property, health and safety of the City of Norfolk and to provide for the usual daily operation of the Department of Public Schools of the City of Norfolk, that the said closed secondary schools be immediately opened and operated pursuant to the Act of the General Assembly * * *."

The six schools having been closed by the Acts of Assembly (declared unconstitutional by the state and federal courts on January 19, 1959), the Council requested the invocation of the state-operated public school system. No action having been taken by the Governor to effect the state-operated system, the schools remained closed throughout the first half of the school year. Contractual obligations purportedly assumed by the State pursuant to § 22–188.14 have been regularly paid by the School Board from funds supplied by the Council, but the State has paid no portion of this commitment which now exceeds $1,000,000. The statute, § 22–188.14, being a part and parcel of the unconstitutional "massive resistance laws", the Governor has advised the President of the Council that the money must now be separately appropriated by the General Assembly of Virginia, which appropriation, the Governor has informed the President of the Council, he will recommend. From the evi-

---

election by the people to be held during the month of June, to determine whether the cash appropriation for schools as fixed by the Council should be in accordance with the amount requested by the Division Superintendent.

**3.** The provisions of Chapter 69 (§ 22–188.-30 through § 22–188.40 of the Code of Virginia, 1950, as amended by the Extra

Session, 1956) purport to put in operation a state-established school system under the guidance of the Governor, for and on behalf of the General Assembly. While the statutes would appear to be mandatory wherever action is requested by the local governing body, the Governor did not see fit to exercise the obligations imposed under Chapter 69.

dence adduced at the trial of this case, it is perfectly apparent that Council viewed its prospects of collecting this obligation as considerably aided by its action under the resolution adopted on January 13, 1959, which is the particular resolution under attack herein; the theory being that continued aid to the massive resistance program of Virginia would tend to persuade sympathetic listeners. Whatever may be the merits of this argument, and irrespective of how conjectural it may be, it has nothing whatsoever to do with the financial obligations of the City of Norfolk for the calendar-fiscal year of 1959. The tax rate has been established for the new year and is predicated upon the operation of all public schools. If the City is financially unable to operate by reason of the loss inflicted upon it under the unconstitutional statutes, there are other avenues open for the purpose of securing the needed revenue [4]. Aside from this fact, three Council members testifying herein each admitted that, but for the contemplated violence resulting from integration of the seventeen Negro school children, the budget for schools would have been adopted subject to the customary provisions granting to Council the right to change or cancel the unexpended portion of the amounts and allowances set out in the total budget at any time during the fiscal year.

The resolution of September 30, 1958, adequately discloses Council's views as to the necessity of operating elemen-

tary and secondary public school systems in the City of Norfolk. These views were considerably modified when Council, aware of the pending collapse of Virginia's massive resistance laws, attempted to dictate what schools and grades would be operated on and after February 2, 1959. However, it is admitted by the City Attorney that it is not the function of Council to determine what schools or grades should be operated as a part of the school system of the city. That is a function exclusively reserved to the School Board. Sec. 22–97(6), Code of Virginia, 1950. The School Board's authority in this respect has been usurped by Council's resolution of January 13, 1959, hereinafter discussed. Indeed, the City Attorney conceded in argument that the Council's function with respect to the school system is apparently limited to its right to appoint or reappoint members of the School Board as and when vacancies exist or terms of office expire [5], and its right to appropriate funds consistent with the needs of the school system and the financial ability of the city to meet such requirements through the imposition of taxes.

Manifestly, a federal court ordinarily has no right or power to interfere with appropriations made by the Council for use by the School Board. There is, however, an exception to this rule where the purpose and intent of Council is clearly to flaunt the law of the land and avoid the effect of lawful court orders by participating in a scheme or device to at-

4. § 22–124 of the Code of Virginia, 1950, prohibits the governing body from reducing the appropriation during any school term, except by the same percentage of reduction as all other appropriations are reduced.

§ 22–195 of the Code of Virginia, 1950, authorizes the *school boards* of the cities of Hampton and Norfolk, and the town of Lexington, to charge tuition, under regulations prescribed by the State Board, for pupils attending *high schools*. The tax levy for a subsequent year may be increased to make up the deficit caused by state action.

5. Under the provisions of § 22–89, Code of Virginia, 1950, the terms of office of

two members of the School Board expire annually on June 30. As Norfolk has two separate school districts, there are six members, two of whom become eligible for reappointment or may be replaced annually. While the ultimate long range control of the School Board is undoubtedly vested in the Council through the power of appointment, the intent of the General Assembly to remove the School Board as far as possible from politics is clearly stated by the Supreme Court of Appeals of Virginia in Board of Sup'rs of Chesterfield County v. Chesterfield County School Board, 182 Va. 266, 28 S.E.2d 698, 702.

tain its objective. As the three-judge court said in James v. Almond, supra:

"Such schemes or devices looking to the cutoff of funds for schools or grades affected by the mixing of races, or the closing or elimination of specific grades in such schools, are evasive tactics which have no standing under the law."

And in Cooper v. Aaron, 358 U.S. 1, 17, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5, we find:

"In short, the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the Brown case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously'. Smith v. State of Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 85 L.Ed. 84."

That the rule as stated is equally applicable to the Council in this case is effectively stated in Brown v. Board of Education, 349 U.S. 294, 298, 75 S.Ct. 753, 755, 99 L.Ed. 1083, as follows:

"All provisions of federal, state, or local law requiring or permitting such discrimination [racial discrimination in public education] must yield to this principle."

■ Should the action of the Council herein be classified as an evasive scheme attempted "ingeniously or ingenuously" to perpetuate segregation in public schools?[6] The answer is obvious under the rule in James v. Almond, supra. Undeniably the will of the majority of the people of the City of Norfolk is for a continuation of segregated schools. Nevertheless, the will of the majority must likewise yield to constitutional principles until and unless there be an amendment to the Constitution.

■ Reverting to the Extra Session of the General Assembly of Virginia held in September, 1956, it will be noted that, among many other laws enacted at that time touching upon the racial problem, were two statutes relating to appropriations by local governing bodies for schools and the right of the governing body to direct the cessation of expenditures for school funds[7]. While these

---

6. Immediately following the entry of the injunctive decree, the Council issued a public statement reading in part as follows:

"The Council, pursuant to the expressed will of the majority of the people whom it represents, has endeavored to stand against what it considers to be an abridgment of constitutional rights guaranteed to it and the citizens of Norfolk. The action of the United States District Court, unless reversed on appeal, prevents the Council from doing what it deems to be in the best interests of the City, but, pending the outcome of the appeal which will be taken, the Council must abide by the order of the District Court."

7. § 22–127 of the Code of Virginia, 1950, as amended by the 1956 Extra Session, is as follows:

"In lieu of making such school levy, the governing body of any county or city may, in its discretion, make a cash appropriation, either tentative or final, from the funds derived from the general county or city levy of an amount not less than the sum required by the county or city school budget provided for by § 22–122 and approved by the governing body of the county or city, but in no event to be less than the minimum nor more than the maximum amount which would result from the laying of the school levy authorized by the preceding section for the establishment, maintenance and operation of the schools of the county or city and for the payment of grants for the furtherance of elementary or secondary education and transportation costs. In addition to this, the governing body of any county or city may appropriate, either tentatively or finally, from any funds available, such sums as in its judgment may be necessary or expedient for the establishment, maintenance and operation of the public schools in the county or city, and for the payment of such grants and transportation costs required or authorized by law.

"Whenever any such appropriations have been made on a tentative basis, no part of the funds so appropriated shall, in

statutes appear to conflict with § 22–124 of the Code of Virginia, 1950, which restricts the right of the governing body to decrease, at any time during a school term, the amount appropriated for schools for such term, except by the same percentage of reduction as all other appropriations are reduced, it is unnecessary to determine the constitutionality of § 22–127 and 22–127.1. The presumption of constitutionality carries with it the corresponding presumption that it will be constitutionally applied. Shuttlesworth v. Birmingham Board of Education, D.C., 162 F.Supp. 372, 384, affirmed upon the limited grounds therein stated, 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145. Surely the General Assembly of Virginia could not have intended that § 22–127 and § 22–127.1 would be unconstitutionally applied to avoid the law of the land through the medium of an evasive scheme or device.

Following the enactment of § 22–127 and § 22–127.1, the Council adopted its budget for the fiscal year beginning January 1, 1957, the following language appearing for the first time in the history of the city:

> "Section 4: The appropriations in said Annual Budget, as approved, for the maintenance and operation of public schools, are made on a tentative basis, and the Council reserves the right to change or cancel the unexpended portion of the same at any time during said fiscal year."

When the foregoing ordinance was adopted on November 27, 1956, the Beckett case was then before this Court. For the fiscal year beginning January 1, 1958, the same language was contained in the budget ordinance adopted November 26, 1957. The adoption of the school budget for the fiscal years 1957 and 1958 on a "tentative" basis was never changed during those years—nor were the appropriations reduced or stopped in any manner.

For the fiscal year beginning January 1, 1959, adopted November 25, 1958, the Council inserted in its Annual Budget the following:

> "Section 5:—That, by reason of the present legal situation with regard to the operation of the public schools of the City, the appropriation herein made for said public schools is made on a tentative basis, and no part of the funds so appropriated shall, in any event, be available to The School Board of the City of Norfolk except as the Council may, from time to time, by resolution authorize the payment or transfer of such funds, or any part thereof, to said School Board.

> "Section 6:—That the appropriation herein made for the public schools of the City is made on a tentative basis; that the Council reserves the right to cancel the unexpended portion of said appropriation for public schools at any time

any event, be available to the local school board except as the local governing body may, from time to time, by resolution authorize the payment or transfer of such funds, or any part thereof, to such local school board."

§ 22–127.1 of the Code of Virginia, 1950, as amended by the 1956 Extra Session, is as follows:

"Notwithstanding any other provision of law to the contrary, the governing body of any county, city or town which has made a levy for school purposes under § 22–126 or § 22–129 or has made a cash appropriation under § 22–127 or any other provision of law may by resolution direct the school board of such county, city or town and the treasurer of such county, city or town to make no further expenditures of local school funds until further authorized to do so by such local governing body. Any school board, and each member thereof, and any treasurer who makes any expenditure of local school funds after being so directed not to make such expenditures shall be personally liable to make restitution to the county, city or town involved of the funds so expended in violation of any such resolution of the local governing body and may be removed from office under the provisions of article 3 (§ 15–500 et seq.), chapter 16, Title 15, of the Code."

during said fiscal year; and that the Council reserves the right to prohibit the expenditure of the unexpended portion, or any part thereof, of said appropriation for public schools."

The foregoing ordinance similarly provided for a severability clause under Section 10 to protect the remaining portions of the budget in the event any section, sentence or clause, be declared unconstitutional or void. In all of its budget ordinances since the year 1945, the severability clause did not appear until the budget for the fiscal year 1959 when it became apparent that the "massive resistance laws" were about to be declared unconstitutional.

On December 30, 1958, the Council adopted a resolution authorizing the transfer of $1,098,000 to the School Board for the use of said School Board during the month of January, 1959, but further stipulated that "no part of said sum shall be disbursed for the normal daytime operation of the schools now under the control of the Governor of Virginia without his prior approval".

Thereafter, on January 13, 1959, the Council adopted a further resolution.[8] After reciting in the preamble certain provisions of the budget ordinance adopted November 25, 1958, relating to schools, the resolution continues:

"Whereas, it is necessary for the immediate preservation of the public peace, property, health and safety and for the usual daily operation of the Department of Finance that the sense of the Council with respect to the maintenance and operation of the public schools of the City of Norfolk be immediately stated, an emergency is set forth, defined and declared to exist, pursuant to Section 15 of the Norfolk Charter of 1918; now, therefore,

"Be it resolved by the Council of the City of Norfolk:

"Section 1: That the public welfare of the City of Norfolk requires the maintenance and operation of grades 1 through 6, both inclusive, as the public schools of said City.

"Section 2: That the Council does not propose, at this time, to authorize the payment or transfer to The School Board of the City of Norfolk, for use by it during the month of February, 1959, or during any month subsequent thereto for the maintenance and operation of any grade higher than the sixth grade, of any part of the funds tentatively appropriated for the public schools of the City of Norfolk by the annual appropriation ordinance of the City of Norfolk for the fiscal year 1959, adopted November 25, 1958; and that said School Board is hereby requested to make such arrangements as may be necessary to maintain and operate, beginning February 2, 1959, only grades 1 through 6, both inclusive.

"Section 3: That the City of Norfolk will assume payment of the salaries and wages of the employees of said School Board which become due and payable after February 2, 1959, under contracts between said School Board and its employees in effect on February 2, 1959, and which are not otherwise paid or provided for.

"Section 4: That the City Clerk is hereby directed to transmit a certified copy of this resolution to each member of said School Board and to the Division Superintendent of Schools of the City of Norfolk.

"Section 5: That this resolution, being an emergency resolution, shall be in effect from and after its adoption."

The effect of the resolution of January 13, 1959, if carried out, would not only continue closed the six schools previously

8. Six of the seven members of Council voted for the resolution. Councilman Roy B. Martin, Jr., voted against the resolution.

locked by reason of the "massive resistance laws", but would also deprive approximately 7,000 additional children of the benefits to be derived from a public school education. A total of approximately 17,000 school children would be without public schools to attend—about 40% of the total normal school attendance in the City of Norfolk. The irreparable damage is obvious and requires no further discussion.

■ The resolution directly violates the provisions of § 22–126 of the Code of Virginia, 1950, as amended, wherein the city is authorized to raise money by a tax on all property, subject to local taxation, at such rate as may be deemed sufficient, "to be expended by the local school authorities in establishing, maintaining and operating such schools as in their judgment [the local school authorities] the public welfare requires * *." The Council has seen fit to declare what the public welfare requires with respect to the schools and grades to be maintained and operated. This it cannot do as such right and power is reserved to the School Board. Code of Virginia, 1950, as amended, §§ 22–93, 22–97(6), 22–97 (12). Board of Sup'rs of Chesterfield County v. Chesterfield County School Board, supra. Constitution of Virginia, § 136. As previously suggested, the members of the School Board are unanimous in their view that the public welfare requires the maintenance and operation of the 12 grades which were functioning prior to the effectiveness of the "massive resistance laws" closing six of the secondary schools.

■ The evidence presented by three members of the Council points to an economy move, but this is not seriously urged as all admit that, but for the assignment of the 17 Negro children to previously all-white schools, the finances of the city are sufficient to support the normal 12 grades. Moreover, the city has assumed the payment of all contractual obligations of the School Board which comprises 92% of the total cost of operation. While the President of the Council takes issue with the Division Superintendent as to this estimate by endeavoring to compare school operation with that of a private business, he has no figures to contradict same, and a glance at the school budget clearly discloses that the Division Superintendent was remarkably accurate in his estimate. Thus, for a saving of 8% of the budget, the Council seeks to completely eliminate the expenditure of funds for 10 schools operating grades 8 through 12, both inclusive (classified as junior and senior high schools), and reduce the expenditure of funds for 32 other schools which maintain the seventh grade. It requires no argument to point out that the saving as to the 32 schools would be negligible as these schools would continue in operation for the purpose of serving grades 1 through 6. As to the remaining ten schools, the contractual obligations having been assumed by the city under its resolution, the saving would be *de minimis* as these schools, even in an idle status, must maintain a certain amount of heat, light, water, and other necessities. This Court finds that the intent and purpose of Council in adopting its resolution of January 13, 1959, was not associated with any need for economy in operation of the public school system.[9]

■ This brings us to a consideration of the main force of Council's argument which is the threat of violence to persons and possible damage to school properties valued at many millions of dollars.[10] The

9. While the motive of a legislative body is not the proper subject of inquiry by a court, it is well settled that the legislative purpose and intent may be properly considered. National Ass'n for Advancement of Colored People v. Patty, D.C., 159 F.Supp. 503, 515, and authorities therein cited; Hudson v. American Oil Co., D.C., 152 F.Supp. 757, 770;

Adkins v. School Board of the City of Newport News, D.C., 148 F.Supp. 430, 434. And see the recent decision of the Supreme Court of Appeals of Virginia in Board of County Sup'rs of Fairfax County v. Davis, Va., 106 S.E.2d 152, 157.

10. Exactly how this theory could be maintained as to the 32 schools in which the

President of the Council testified that he had received 50 to 100 anonymous telephone calls threatening violence to schools in which Negro children were assigned, and to schools attended solely by Negro children if permitted to remain open while previously all-white schools were closed. Presumably these calls were received prior to the action of the Supreme Court of Appeals of Virginia in Harrison v. Day. Even if the good faith of Council may be assumed, the argument falls by reason of the decided authorities holding that the preservation of the public peace cannot operate in such a manner as to cause constitutional rights to be sacrificed or yielded. Buchanan v. Warley, 245 U.S. 60, 81, 38 S.Ct. 16, 62 L.Ed. 149; Cooper v. Aaron, supra. Indeed, the President of the Council was unable to answer the inquiry as to how the City of Norfolk could ever operate a school attended by members of both races under such circumstances.

 As the President of the Council stated that he would not want to operate any schools where there are threats of violence, and as § 17 of the Charter grants certain powers to the President, with the consent of the Council in time of public danger or emergency, this Court has seen fit to include in the preliminary injunction a reasonable limitation upon the possible abuse of the exercise of that police power. While undoubtedly the police power is an inherent attribute of the sovereignty, it is well settled that its use is limited by the spirit and letter of the Constitution to prevent an unconstitutional exercise of that power. Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643; Buchanan v. Warley, supra; Faubus v. United States, 8 Cir., 254 F.2d 797, 805; Aaron v. Cooper, 8 Cir., 257 F.2d 33, 40, affirmed sub nom. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 .L.Ed.2d 5.

 The clear purport of Council's action is tantamount to an evasive scheme or device seeking to perpetuate the program of massive resistance in the public schools of the City of Norfolk. It violates the laws of Virginia, as well as the laws and Constitution of the United States. The only alternative rests in the issuance of a preliminary injunction to prevent the Council from taking such action as will deprive the School Board of its rights, powers, duties and obligations conferred upon it by the laws of Virginia, and from "ingeniously or ingenuously" whittling away or watering down the orders of this Court which have heretofore become final and affirmed on appeal in several instances.

 Disposing of the motion to dismiss, it would perhaps be sufficient to again refer to James v. Almond, supra. Clearly, however, this is not an action against the state under the eleventh Amendment to the Constitution of the United States. The statutes (§ 22–127 and 22–127.1) are permissive and not mandatory, which precludes the necessity of a three-judge court. Ex parte Collins, 277 U.S. 565, 48 S.Ct. 585, 72 L.Ed. 990. The statutes refer only to local school funds. Hamilton Gas Light Co. v. Hamilton City, 146 U.S. 258, 13 S.Ct. 90, 36 L.Ed. 963, restricted its decision to the interpretation of state laws impairing the obligation of contracts. In Mayor of City of Savannah v. Holst, 5 Cir., 132 F. 901, the facts presented no dispute about the construction of the Constitution or laws of the United States, and were confined to questions dependent for their solution on the laws of Georgia. Cf. Barney v. City of New York, 193 U.S. 430, 24 S.Ct. 502, 48 L.Ed. 737, as qualified and restricted by Home Telephone & Telegraph Co. v. City of Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 317, 57 L.Ed. 510, in which latter case it is said:

seventh grade would be eliminated is not clear as no Negro child has been assigned to previously all-white schools in the 32 schools mentioned. Presumably Council was endeavoring to avoid dis-

crimination as the majority of schools in the system are maintained on a 6–3–3 basis. The discrimination would nevertheless exist. James v. Almond, supra.

"But, as we have already pointed out, it was long since settled that acts done under the authority of a municipal ordinance passed in virtue of power conferred by a state are embraced by the 14th Amendment."

The end result of Home Telephone & Telegraph Co. v. City of Los Angeles, supra, is to apply to municipal ordinances the same limitations placed upon state officers in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714; Barney v. City of New York, supra, has been discredited by later decisions (as noted above and Raymond v. Chicago Union Traction Co., 207 U.S. 20, 37, 28 S.Ct. 7, 52 L.Ed. 78; Snowden v. Hughes, 321 U. S. 1, 64 S.Ct. 397, 88 L.Ed. 497).

The motion to dismiss is denied.